1   Jeffrey D. Wexler, State Bar No. 132256
2   Raymond O. Aghaian, State Bar No. 218294
    Jennifer Seigle, State Bar No. 285670
    MCKENNA LONG & ALDRIDGE LLP
3   300 South Grand Avenue, Suite 1400
    Los Angeles, California 90071
4   Telephone No.: 213.688.1000
    Fax No.: 213.452.8029
5   E-Mail:   jwexler@mckennalong.com
              raghaian@mckennalong.com
6             jseigle@mckennalong.com

7   Attorneys for Plaintiffs Schaffer Family Investors LLC
    and Robert Schaffer
8
                   UNITED STATES DISTRICT COURT
9
                  CENTRAL DISTRICT OF CALIFORNIA
10
                        WESTERN DIVISION
11

12  | SCHAFFER FAMILY INVESTORS, | Case No. CV 13-5814-SVW (JEMx) |

SCHAFFER FAMILY INVESTORS, LLC, a Delaware limited liability company; and ROBERT SCHAFFER, an individual,

Plaintiffs,

v.

LEE SONNIER, an individual; KRIS MELANCON, an individual; PINNACLE OIL & GAS, LLC, a Louisiana limited liability company; LEMEL PETROLEUM, LLC, a Louisiana limited liability company; and DOES 1 through 10, inclusive,

Defendants.

Case No. CV 13-5814-SVW (JEMx)

**FIRST AMENDED COMPLAINT FOR: (1) FEDERAL SECURITIES LAW VIOLATIONS BASED UPON SALE OF UNREGISTERED SECURITIES [15 U.S.C. §§ 77e(a), 77l(a)] AND FALSE REPRESENTATIONS AND NONDISCLOSURES [15 U.S.C. § 78j(b) and SEC Rule 10b-5]; (2) CALIFORNIA SECURITIES LAW VIOLATIONS BASED UPON SALE OF UNREGISTERED SECURITIES [Cal. Corp. Code §§ 25110, 25503] AND FALSE REPRESENTATIONS AND NONDISCLOSURES [Cal. Corp. Code §§ 25401, 25501]; (3) FRAUD; (4) BREACH OF FIDUCIARY DUTY; (5) BREACH OF CONTRACT; (6) INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS; (7) STATUTORY UNFAIR COMPETITION [Cal. Bus. & Prof. Code §§ 17200 et seq.]; (8) ACCOUNTING; AND (9) LOUISIANA SECURITIES LAW VIOLATIONS BASED UPON SALE OF UNREGISTERED SECURITIES [La. Rev. Stat. §§ 51:714, 51:712, 51:705] AND FALSE REPRESENTATIONS AND NONDISCLOSURES [La. Rev. Stat. §§ 51:714. 51:712]**

**DEMAND FOR JURY TRIAL**

1   Plaintiffs Schaffer Family Investors, LLC ("SFI") and Robert Schaffer

2   ("Schaffer") (collectively, "Plaintiffs") allege as follows:

3   **JURISDICTION AND VENUE**

4   1.   The Court has federal question jurisdiction under 28 U.S.C. § 1331

5   and 15 U.S.C. § 78aa over Plaintiffs' First and Second Claims for Relief for

6   violation of the federal securities laws.  The Court has supplemental jurisdiction

7   over Plaintiffs' Third through Fourteenth Claims for Relief under 28 U.S.C.

8   § 1367(a) because those claims are so related to Plaintiffs' claims within the Court's

9   original jurisdiction that they form part of the same case or controversy under

10  Article III of the United States Constitution.

11  2.   Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a

12  substantial part of the events or omissions giving rise to Plaintiffs' claims occurred

13  in this district.

14  **THE PARTIES**

15  3.   SFI is a limited liability company organized and existing under the laws

16  of the State of Delaware with its principal place of business in the County of Los

17  Angeles, State of California.

18  4.   Schaffer is an individual residing in the County of Los Angeles, State

19  of California.

20  5.   Plaintiffs are informed and believe, and based thereon allege, that

21  defendant Lee Sonnier ("Sonnier") is an individual who resides in the County of Los

22  Angeles, State of California.

23  6.   Plaintiffs are informed and believe, and based thereon allege, that

24  defendant Kris Melancon ("Melancon") is an individual who resides in Lafayette

25  Parish, State of Louisiana.  Melancon has done and is doing business in the State of

26  California and is subject to personal jurisdiction in this district.

27  7.   Plaintiffs are informed and believe, and based thereon allege, that

28  defendant Pinnacle Oil & Gas, LLC ("Pinnacle") is a limited liability company

2

organized and existing under the laws of the State of Louisiana with its principal

place of business in the State of Louisiana.  Plaintiffs are further informed and

believe, and based thereon allege, that Pinnacle has done and is doing business in

the State of California and is subject to personal jurisdiction in this district.

8.   Plaintiffs are informed and believe, and based thereon allege, that

defendant Lemel Petroleum, LLC ("Lemel") is a limited liability company

organized and existing under the laws of the State of Louisiana with its principal

place of business in the State of Louisiana.  Plaintiffs are further informed and

believe, and based thereon allege, that Lemel has done and is doing business in the

State of California and is subject to personal jurisdiction in this district.

9.   Plaintiffs are ignorant of the true names and capacities of the

defendants sued herein as Does 1 through 10, inclusive, and therefore sue those

defendants by such fictitious names.  Plaintiffs will amend the complaint to allege

their true names and capacities when ascertained.  Plaintiffs are informed and

believe, and on that basis allege, that each of the fictitiously named defendants is

responsible in some manner for the occurrences herein alleged, and that the losses

sustained by Plaintiffs as herein alleged were proximately caused by the conduct of

such defendants.  Sonnier, Melancon, Pinnacle, Lemel, and Does 1 through 10,

inclusive, shall be collectively referred to herein as "Defendants."

10.   At all times mentioned herein, each of the Defendants was the agent,

partner, servant, employee, and joint venturer of each of the other Defendants, and

each such Defendant was acting within the purpose, course, and scope of said

agency, employment, or joint venture with the consent, knowledge, and ratification

of each of the other Defendants.

## **FACTUAL BACKGROUND**

11.   This lawsuit arises out of Defendants' sale to Plaintiffs of oil, gas, and

mineral royalty and leasehold interests (the "Interests") in the States of Louisiana,

Mississippi, Oklahoma, and other states.  As alleged more fully herein, Defendants

induced Plaintiffs to make purchases of the Interests by: (a) misrepresentations made to Plaintiffs in Los Angeles County by Sonnier, acting on behalf of Melancon, Pinnacle, Lemel, and Does 1 through 10 (collectively, the "Melancon Defendants") in negotiating or arranging Plaintiffs' purchases of the Interests; and (b) misrepresentations made by Melancon through (i) e-mails sent directly to SFI in Los Angeles County, (ii) e-mails sent to his agent, Sonnier, with the understanding and intent that those e-mails, or the information contained therein, be forwarded to Plaintiffs in Los Angeles County, and (iii) on information and belief, information provided to his agent, Sonnier, in telephone calls, with the understanding and intent that such information be provided to Plaintiffs in Los Angeles County.

### A.   Purchases of Interests by Schaffer.

12.   Beginning in July 2008 and continuing through May 2012, Schaffer paid the Melancon Defendants approximately $5,330,725.60 (including $513,000 in purchases made along with SFI) to purchase the Interests identified in detail in the chart attached hereto as Exhibit A and incorporated by reference as though fully set forth herein.  Schaffer purchased each Interest by accepting written offers presented to him by Sonnier.

13.   In or about September 2007, Schaffer met Sonnier through a mutual friend, Don Elster, who had made prior investments with and through Sonnier.  At a meeting soon afterwards among Schaffer, Elster, and Sonnier, Sonnier stated that: (a) he was a retired attorney who came from a family of extensive wealth; (b) he was interested and active in various investment and business activities; (c) years earlier he had been a participant in an investment group comprised of engineers, accountants, investors, and other attorneys; and (d) such group had successfully invested in various deals throughout the years.

14.   Beginning soon thereafter, Schaffer, Elster, and Sonnier sporadically looked at various potential investments.

4

15.     In or about July 2008, Sonnier contacted Schaffer in Los Angeles County to solicit Schaffer to purchase, through Sonnier as Schaffer's agent, Interests that had been acquired or were to be acquired by the Melancon Defendants, with Sonnier and Melancon also purchasing such Interests for their own account (or their family members' account).  At such time, Sonnier stated, and Schaffer understood, that Sonnier would invest in Interests to buy and then resell quickly such Interests for lucrative profits.  Sonnier offered to share this opportunity with Schaffer to participate in such venture if Schaffer forwarded funds within a day or so.  (Sonnier made such proposal contemporaneously to Elster.)

16.     Sonnier represented to Schaffer that he had a very close connection with Melancon (and that Sonnier's father and Melancon's father had done similar business activities together) and that Melancon was a highly experienced landman (a person negotiating and acquiring oil, gas, and mineral royalty and leasehold interests from landowners or from other holders of such rights) located in Lafayette, Louisiana who was in the business of investing for his own account in, and buying, selling, and raising money from various investors to purchase, oil, gas, and mineral royalty and leasehold interests.  Sonnier further represented that Melancon had extensive contacts and relationships in the oil and gas business with special knowledge of: (a) the future drilling and production plans of major oil and gas operators; and (b) the plans of other participants in the business of investing, buying, and selling oil, gas, and mineral royalty and leasehold interests.

17.     Sonnier held himself out to be, and told Schaffer that he was, a retired attorney with vast legal, business, and investment knowledge and experience, primarily in the oil and gas industry, and with vast immediate family background in, and family wealth created in, the oil and gas investment business (including from property and mineral rights owned by Sonnier and his immediate family).  Sonnier told Schaffer that he had graduated from New York University Law School, that he was licensed to practice law in the States of California, Louisiana, and New York,

and that he had practiced law in Beverly Hills for many years; in fall 2007, when Schaffer first met Sonnier, Sonnier told Schaffer that he had been retired for about 12 years.

18.     Sonnier further induced Schaffer to purchase Interests by claiming that, along with Melancon, Sonnier had invested, and would continue to invest, his personal funds and/or his immediate family's funds into Interests being acquired by Melancon and his companies.  Sonnier offered Schaffer to co-invest in the same Interests and in the same amount in which Sonnier, and/or his immediate family, would be investing and told Schaffer that Melancon would be investing in the same Interests in an amount equal to what both Schaffer and Sonnier were investing so that Schaffer would acquire one-fourth of such purported Interest, Sonnier would acquire another one-fourth of such purported Interest, and Melancon would acquire the remaining one-half of such purported Interest.

19.     Based on representations made by Sonnier, Schaffer entered into a verbal agency agreement for Sonnier to serve as Schaffer's agent to evaluate, recommend, acquire, verify, and administer on Schaffer's behalf the same Interests being purchased by Melancon and Sonnier as offered by the Melancon Defendants.

20.     Schaffer's purchases of Interests were presented to Schaffer in the State of California.  Plaintiffs are informed and believe, and based thereon allege, that Schaffer's purchases of Interests were arranged with the Melancon Defendants by Sonnier, acting within the State of California.  The Melancon Defendants had actual knowledge that: (a) they were contracting with a principal, Schaffer, who lived in the State of California; and (b) they would be transacting business with Schaffer in the State of California through Sonnier, who was simultaneously serving as Schaffer's agent and, unbeknownst to Schaffer, as the Melancon Defendants' agent. All of Schaffer's purchases of Interests were based upon invoices sent from Melancon to Sonnier, and then from Sonnier to Schaffer, and Schaffer made almost

1    all of the payments for the purchase of Interests directly to the Melancon
2    Defendants.

3         21.    Sonnier, acting also as a sales agent for the Melancon Defendants, and
4    acting within the scope of his agency relationship with the Melancon Defendants,
5    represented to Schaffer orally in Los Angeles County in or about July 2008 and at
6    various times thereafter, including in the July and August 2012 e-mails described
7    below, that:

8              (a)    the purchase price to be paid by Schaffer for any Interests
9         purchased from the Melancon Defendants would be (i) the actual
10        purchase cost paid by the Melancon Defendants (with regard to
11        Schaffer's purchases of Interests prior to his purchase of Interests along
12        with SFI) or (ii) the actual purchase cost paid by the Melancon
13        Defendants plus three percent (3%) (with regard to Schaffer's
14        purchases of Interests along with SFI), and that the Melancon
15        Defendants (and Sonnier) were purchasing Interests, on the same basis
16        as Schaffer, at industry players' wholesale prices negotiated by
17        Melancon through his long-term experience in the business;

18             (b)    Sonnier and the Melancon Defendants (or their related
19        entities or family members) would each acquire for their own
20        respective accounts at least an equal interest in, and invest at least an
21        equal amount of money in, any Interests to be acquired by Schaffer, so
22        that any oil, gas, and mineral royalty and leasehold interests in
23        properties as to which Schaffer purchased Interests (with the exception
24        of the third "flip property," discussed below) would be as follows:
25        whatever amount was invested by Schaffer, Sonnier would likewise
26        invest, and Melancon would invest an amount equal to what both
27        Schaffer and Sonnier invested, and each purchased interest was to be

28

1    held in each purchaser's separate legal name as an undivided interest

2    (with the exception of the "flip properties," discussed below);

3              (c)    with the exception of the three percent (3%) mark-up

4    charged by the Melancon Defendants on the later purchase of Interests

5    (made with SFI), there would be no other financial benefit to Schaffer,

6    Melancon, or Sonnier, except for the benefit, shared jointly, of

7    acquiring Interests on more favorable terms as a result of making

8    combined purchases;

9              (d)    the Interests would be purchased at a specified price and in

10   a specified number of royalty acres at a specified location (the Interests

11   were sometimes invoiced with the locations to be provided at a later

12   date); and

13             (e)    the term of the Interests in Louisiana would be 10 years

14   (*i.e.*, the lease would expire in 10 years unless there was a valid and

15   existing oil and gas lease from which oil and/or gas was being

16   produced in paying quantities), unless the royalty was specifically

17   disclosed to expire in a shorter period, or, for Interests with terms of

18   less than 10 years, that there was imminent planned production that

19   would be completed within such shortened term so that the Interests

20   being acquired would be secured by production within such term.

21        22.    Sonnier also sent Schaffer what purported to be forwarded e-mails from

22   Melancon offering Interests, in which Sonnier increased the price per royalty acre

23   stated in the e-mail so as to falsely represent that the price being offered to Schaffer

24   was the price paid by Melancon and to indicate that Sonnier was purchasing an

25   equal share of the Interests.  For example:

26             (a)    On October 13, 2009, Melancon sent Sonnier an e-mail

27   indicating that Melancon was offering to sell to Schaffer (i) 4.0 royalty

28   acres for $4,700/royalty acre and (ii) 3.5 acres for $4,700/royalty acre.

1    On October 19, 2009, Sonnier sent Schaffer what purported to be a

2    forwarded e-mail from Melancon, modifying the text of the e-mail

3    actually received from Melancon to state that Melancon was offering to

4    sell (i) 4.0 royalty acres for $6,700/royalty acre and (ii) 7.0 royalty

5    acres for $6,700/royalty acre.

6          (b)    On January 4, 2012, Melancon sent Sonnier an e-mail

7    stating that Melancon was offering to sell (i) 4.8 royalty acres for

8    $6,000/royalty acre and (ii) 5.0 royalty acres for $4,000/royalty acre.

9    On January 13, 2012, Sonnier sent Schaffer what purported to be a

10   forwarded e-mail from Melancon, modifying the text of the e-mail

11   actually received from Melancon to state that Melancon was offering to

12   sell (i) 9.0 royalty acres for $7,000/royalty acre and (ii) 10 royalty acres

13   for $5,500/royalty acre.

14         (c)    On April 13, 2012, Melancon sent Sonnier an e-mail

15   stating that Melancon was offering to sell Interests to Schaffer and SFI

16   at $2,000 per royalty acre.  On April 24, 2012, Sonnier sent Schaffer

17   what purported to be a forwarded e-mail from Melancon, modifying the

18   text of the e-mail actually received from Melancon to state that

19   Melancon was offering to sell Interests to Schaffer and SFI at $3,100

20   per royalty acre.  Sonnier also modified the e-mail to include the

21   following statement, purportedly from Melancon: "I have 180/acres left

22   after my buy on the same terms and price I paid.  I would suggest that

23   you each take 90/acres.  It will give you 30/acres in each of the sections

24   and encompass the most productive areas in each unit."

25   23.    Schaffer paid the prices set forth in the e-mails that Sonnier purported

26   to forward from Melancon, not knowing that the prices had been inflated by Sonnier

27   or that the prices quoted by Melancon were marked up from Melancon's actual

28   purchase cost.  Schaffer relied upon, *inter alia*, Defendants' representations that

Sonnier and the Melancon Defendants would be investing their own personal money, or the money of related persons or entities, on the same basis and in at least the same amounts as set forth above and at the same cost-basis price as Schaffer. Based upon those representations and Sonnier acting as Schaffer's advisor, agent, and confidant, Schaffer relied upon Defendants' representations concerning the merits and value of each proposed investment in an  Interest.  From July 2008 through about August 2012, Sonnier spent many hundreds of hours working with Schaffer describing the economic viability, benefits, and legal aspects of the purchases of Interests that Defendants suggested that Schaffer make, as co-investments with Defendants.

24.    As a result of Defendants' representations, Schaffer paid the Melancon Defendants approximately $5,330,725.60 (including $513,000 in purchases made along with SFI) to purchase the Interests identified in detail in the chart attached hereto as Exhibit A and incorporated by reference as though fully set forth herein. However, the Melancon Defendants retained a portion of the monies paid by Schaffer that was sufficient to cover the costs they paid to acquire the Interests sold to Schaffer, along with a profit on the sale of such Interests.  The Melancon Defendants thereafter: (a) paid Sonnier a substantial proportion of the monies received from Schaffer as a "finder's fee," generally paid out of the Melancon Defendants' share of the payments made by Schaffer; and (b) paid a larger proportion of the monies received from Schaffer (generally paid from the monies paid by Schaffer as a result of Sonnier's mark-up of the price that the Melancon Defendants said they would charge for the Interests) to an inactive Louisiana corporation named Media/Right Properties, Ltd. ("Media/Right"), a corporation of which Sonnier is the sole officer, according to the Louisiana Secretary of State's website, based, according to the Melancon Defendants, upon Sonnier's representations to them that Schaffer was receiving the payments being made to Media/Right.  Had Schaffer known that Sonnier, contrary to Sonnier's false

1   representations that Sonnier was receiving no financial benefit from Schaffer's

2   purchases of Interests, was actually receiving millions of dollars in "finder's fees"

3   and payments to Sonnier through Media/Right out of the monies that Schaffer was

4   paying to purchase Interests, Schaffer would not have purchased such Interests.

5              **B.    Purchases of Interests by SFI.**

6         25.    Beginning in February 2012 and continuing through August 13, 2012,

7   SFI paid the Melancon Defendants approximately $2,101,400 to purchase the 13

8   Interests identified in detail in the chart attached hereto as Exhibit B and

9   incorporated by reference as though fully set forth herein.  (Schaffer, as an

10  individual, purchased Interests in 11 of the 13 properties in which SFI purchased

11  Interests at a cost to Schaffer of approximately $513,000.)  SFI purchased each

12  Interest by accepting written offers presented to it by Sonnier.

13        26.    Schaffer introduced Sonnier to Schaffer's father, Herbert Schaffer,

14  SFI's representative.

15        27.    Based on representations made by Sonnier, including Sonnier's

16  representations that he is an attorney licensed to practice law and concerning his

17  experience, knowledge, and personal investments with regard to Interests, as well as

18  Sonnier's representation that he would be purchasing for his own account the same

19  Interests as SFI and in the same amounts and that Melancon would be investing an

20  amount equal to what Schaffer, SFI, and Sonnier combined would be investing in

21  each Interest, SFI entered into a verbal agency agreement for Sonnier to serve as

22  SFI's agent to evaluate, recommend, acquire, verify, and administer on SFI's behalf

23  Interests being offered by the Melancon Defendants.

24        28.    SFI's purchases of Interests were presented to SFI in the State of

25  California.  Plaintiffs are informed and believe, and based thereon allege, that SFI's

26  purchases of Interests were arranged with the Melancon Defendants by Sonnier,

27  acting within the State of California.  The Melancon Defendants had actual

28  knowledge that: (a) they were contracting with a principal, SFI, that had its place of

business in the State of California; and (b) they would be transacting business with SFI in the State of California through Sonnier, who was simultaneously serving as SFI's agent and, unbeknownst to SFI, as the Melancon Defendants' agent. All of SFI's purchases of Interests were based upon invoices sent directly from Melancon to Sonnier, and then from Sonnier to SFI, and SFI made all payments for the purchase of Interests directly to the Melancon Defendants.

29.    Sonnier, acting also as a sales agent for the Melancon Defendants, and acting within the scope of his agency relationship with the Melancon Defendants, represented to SFI orally in Los Angeles County in or about February 2012 (when Sonnier told SFI that it would be purchasing Interests on the same terms represented by Sonnier to Schaffer in and after July 2008, as alleged above) and at various times thereafter, including in the July and August 2012 e-mails described below, that:

(a)    the purchase price to be paid by SFI for any Interests purchased from the Melancon Defendants would be the actual purchase cost paid by the Melancon Defendants plus three percent (3%), and that the Melancon Defendants (and Sonnier) were purchasing Interests, on the same basis as SFI and Schaffer, at industry players' wholesale prices negotiated by Melancon through his long-term experience in the business;

(b)    Sonnier (or his family members) would each acquire for his own respective account at least an equal interest in, and invest at least an equal amount of money in, any Interests to be acquired by SFI and Schaffer, and Melancon (or his related entities or family members) and parties related to him, would be acquiring and investing in the same Interests in an amount equal to what SFI, Schaffer, and Sonnier collectively invested, so that any oil, gas, and mineral royalty and leasehold interests in properties as to which SFI and Schaffer purchased Interests would be owned approximately one-fourth by SFI and

Schaffer combined (of which approximately 80% would generally be taken by SFI and approximately 20% would generally be taken by Schaffer), one-fourth by Sonnier, and one-half by the Melancon Defendants, and each purchased interest was to be held in each purchaser's separate legal name as an undivided interest;

(c)     with the exception of the three percent (3%) mark-up charged by the Melancon Defendants on the purchase of Interests, there would be no other financial benefit to Schaffer, SFI, Sonnier, or Melancon, except for the benefit, shared jointly, of acquiring Interests on more favorable terms as a result of making combined purchases;

(d)     the Interests would be purchased at a specified price and in a specified number of royalty acres at a specified location (the Interests were sometimes invoiced with the locations to be provided at a later date); and

(e)     the term of the Interests in Louisiana would be 10 years (*i.e.*, the royalty would expire in 10 years unless there was a valid and existing oil and gas lease from which oil and/or gas was being produced in paying quantities), unless the royalty was specifically disclosed to expire in a shorter period, or, for Interests with terms of less than 10 years, that there was imminent planned production that would be completed within such shortened term so that the Interests being acquired would be secured by production within such term.

30.     Sonnier also sent SFI what purported to be forwarded e-mails from Melancon offering Interests, in which Sonnier increased the price per royalty acre stated in the e-mail so as to falsely represent that the price being offered to SFI was the price paid by Melancon and to indicate that Sonnier was purchasing an equal share of the Interests.  For example:

(a)      On April 13, 2012, Melancon sent Sonnier an e-mail stating that Melancon was offering to sell Interests to Schaffer and SFI at $2,000 per royalty acre.  On April 24, 2012, Sonnier sent Schaffer what purported to be a forwarded e-mail from Melancon, modifying the text of the e-mail actually received from Melancon to state that Melancon was offering to sell Interests to Schaffer and SFI at $3,100 per royalty acre.  Sonnier also modified the e-mail to include the following statement, purportedly from Melancon: "I have 180/acres left after my buy on the same terms and price I paid.  I would suggest that you each take 90/acres.  It will give you 30/acres in each of the sections and encompass the most productive areas in each unit."

31.      SFI paid the prices set forth in the e-mails that Sonnier purported to forward from Melancon, not knowing that the prices had been inflated by Sonnier or that the prices quoted by Melancon were marked up from Melancon's actual purchase cost.  SFI relied upon, *inter alia*, Defendants' representations that Sonnier and the Melancon Defendants would be investing their own personal money, or the money of related persons or entities, on the basis and in at least the same amounts as set forth above.  Based upon those representations and Sonnier acting as SFI's advisor and agent, SFI relied upon Defendants' representations concerning the merits and value of each proposed investment in an Interest.  During 2012, Sonnier spent perhaps 80 hours working with SFI describing the economic viability, benefits, and legal aspects of the purchases of Interests that Defendants suggested that SFI make, as co-investments with Defendants.

32.      As a result of Defendants' representations, SFI paid the Melancon Defendants approximately $2,101,400 to purchase the 13 Interests identified in detail in the chart attached hereto as Exhibit B and incorporated by reference as though fully set forth herein.  However, the Melancon Defendants retained a portion of the monies paid by SFI that was sufficient to cover the costs they paid to acquire

the Interests sold to SFI, along with a profit on the sale of such Interests.  The
Melancon Defendants thereafter: (a) paid Sonnier a substantial proportion of the
monies received from SFI as a "finder's fee," generally paid out of the Melancon
Defendants' share of the payments made by SFI; and (b) paid a larger proportion of
the monies received from SFI (generally paid from the monies paid by SFI as a
result of Sonnier's mark-up of the price that the Melancon Defendants said they
would charge for the Interests) to Sonnier through his company Media/Right, based,
according to the Melancon Defendants, upon Sonnier's representations to them that
Schaffer was receiving the payments being made to Media/Right.  Had SFI known
that Sonnier, contrary to Sonnier's false representations that Sonnier was receiving
no financial benefit from SFI's purchases of Interests, was actually receiving
hundreds of thousands of dollars in "finder's fees" and payments to Sonnier through
Media/Right out of the monies that SFI was paying to purchase Interests, SFI would
not have purchased such Interests.

<strong>C.</strong> <strong><u>The Falsity of Defendants' Representations.</u></strong>

33. Based on Defendants' representations, Plaintiffs did not conduct any
independent due diligence, and they reasonably relied upon the due diligence to be
conducted by Sonnier as their agent and as their putative joint venturer, and upon
the due diligence to be conducted by the Melancon Defendants as their putative joint
venturers.

34. On July 31, 2012 at 7:29 p.m., Herb Schaffer of SFI sent an e-mail to
Sonnier asking him, *inter alia*, to confirm the terms of the arrangement by which
Plaintiffs were purchasing Interests.  Sonnier and Melancon confirmed such terms as
follows:

  (a) In an e-mail sent by Sonnier at 7:57 p.m. on July 31, 2012,
  Sonnier stated that "Kris buys an amount equal to mind [*sic*] and you
  plus Bob" and that "[t]he total we buy does include small fee for Kris."

(b)    In an e-mail sent by Sonnier at 8:07 p.m. on July 31, 2012, Sonnier stated, "I am a buyer and that is all I do[.]  I do not have any financial benefit from kris are [*sic*] anyone else I purchase minerals from."

(c)    In an e-mail sent by Melancon on August 6, 2012, Melancon stated, "I am writing this email to you to assure you that my companies, Pinnacle Oil & Gas, L.L.C. and Lemel Petroleum, L.L.C. have retained interests in all of the Royalty & Mineral Prospects that you have purchased interests in.  I have been in the royalty business for over 12 years (have been a Petroleum Landman for over 28 years) and have always retained interests in prospects that I purchase royalty/mineral interests in . . . ."

35.    On August 13, 2012, Herb Schaffer of SFI sent a letter to Melancon spelling out SFI's understanding of the terms of the arrangement by which Plaintiffs had purchased Interests and asking Melancon to confirm those terms.  In an e-mail sent by Melancon on August 24, 2012, Melancon responded: (i) "be assured that me, my companies and many of my other investors and/or partners own and will own a sizeable amount of interests in the same prospects that you are buying interests in"; (ii) "be assured that no payments will ever be made to Bob [Schaffer] or Lee [Sonnier] out of any of the payments received from you or Schaffer Family Investors"; and (iii) "be assured that the asking price for interests offered for sale to Schaffer Family Investors will be at cost, plus a profit margin of 3% of the total costs encountered by me and my companies."

36.    In July 2012, Schaffer engaged John G. Miller, Certified Professional Landman of Oil Land Services, Inc. of Lafayette, Louisiana, and Randy Loewen, Esq. of Lafayette, Louisiana, to confirm the value of the properties that Plaintiffs had purchased from Defendants, and to confirm that Defendants had in fact co-invested in the investments presented to and invested in by Plaintiffs.  During this

time, SFI continued to purchase Interests from Defendants through August 13, 2012. In or about late September or early October 2012, Mr. Miller reported that, *inter alia*: (a) Sonnier had not individually purchased **any** Interests in the properties as to which Plaintiffs had purchased Interests; (b) the Melancon Defendants had retained only minor portions of the Interests in only a small portion of the properties as to which Plaintiffs had purchased Interests; and (c) the Interests purchased by Plaintiffs at prices generally in excess of $3,000 per royalty acre were generally valued in the range of less than $1,000 per royalty acre at about the time of purchase.  Mr. Miller also reported that the limited number of landowners whom he had been able to contact told him that they had sold Interests to the Melancon Defendants for $625 to $1,200 per royalty acre (as opposed to the approximately $3,000 or more per royalty acre paid by Plaintiffs to the Melancon Defendants for the same Interests).

       37.     In order to gain further confirmation as to the representations made by Defendants to Plaintiffs, Plaintiffs engaged a special investigator.  Posing as a prospective customer to invest with the Defendants, the private investigator on March 12, 2013 sent an e-mail to Sonnier stating his interest in purchasing Interests in the same manner that Plaintiffs had purchased Interests from Defendants.  In that e-mail to Sonnier, the private investigator stated, *inter alia*:

> Your [Sonnier's] and Chris' [*sic*] [Melancon's] knowledge, expertise, connections and experience as well as your legal background and close long term working relationship with Chris [*sic*], is very reassuring to me.  Further, as I understand based upon Herb and Bob's prior purchases, the purchases are made based upon Chris' [*sic*] judgment, connections and expertise, and that Chris [*sic*] purchases large blocks of acres to procure wholesale pricing in the path of development on behalf of a group of participants that includes you and Chris [*sic*], and with your helpful analysis and explanation of each deal submitted by Chris [*sic*], each participant will get assigned it's [*sic*] mineral rights on an equitable basis in their mineral or royalty acres with a 10 year term, unless specified otherwise.  Most importantly for me, I understand that I will be purchasing the royalties at Chris' [*sic*] purchase cost plus a 3% administrative fee just as previously sold to you, Herb and Bob.  This understanding, along with you and Chris [*sic*] continuing to put your own investment money into each deal in equal or greater amounts, as with Herb and Bob's prior purchases, makes my desire to co-participate appealing.  Finally, based upon our discussion,

1    your understanding is that the sale of mineral rights are [*sic*] not
2    governed by the SEC or state securities regulations.

3    38.    On March 15, 2013, in response to the March 12, 2013 e-mail from the

4    private investigator, Sonnier sent an e-mail to the private investigator stating "You

5    are correct as to you [*sic*] interpretation of how Kris works his deals with Herb, Bob

6    and myself"

7    39.    On April 2, 2013, Herb Schaffer, through his assistant Minnie Lim,

8    sent an e-mail to Melancon stating, *inter alia*, "please confirm that the offer is

9    subject to the same condition of SFI's prior royalty purchases, in that the royalties

10   offered are sold to SFI at your purchase price +3% fee."  On that same day,

11   Melancon responded that "Yes, the offer is subject to the same terms and conditions

12   of SFI prior purchases and a 3% fee added to the per acre cost total."

13   40.    Defendants made false representations to Plaintiffs concerning their

14   purchase of the Interests.  The fact that each of those representations is false on its

15   face gives rise to a strong inference that Defendants acted with the state of mind

16   required for liability under the federal securities laws.  For example:

17         (a)    The purchase price paid by Plaintiffs for Interests

18   purchased from the Melancon Defendants was not (i) the actual

19   purchase cost paid by the Melancon Defendants or (ii) the actual

20   purchase cost paid by the Melancon Defendants plus three percent

21   (3%).  Instead, the purchase price actually charged to Plaintiffs by the

22   Melancon Defendants and actually paid by Plaintiffs to the Melancon

23   Defendants far exceeded the actual purchase cost paid by the Melancon

24   Defendants.

25         (b)    Sonnier and the Melancon Defendants did not acquire and

26   invest the amounts in the Interests as set forth above relative to that

27   acquired by Plaintiffs.  Instead, the Melancon Defendants sold

28   Plaintiffs most of the interests in the Interests, retaining little or no

financial interest in each Interest, and Sonnier did not purchase any share in the Interests.

(c)     Defendants received a financial benefit from Plaintiffs' purchases far in excess of the three percent (3%) mark-up charged by the Melancon Defendants on the purchase of Interests by SFI and by Schaffer along with SFI.  As alleged above, the payments received by the Melancon Defendants from Plaintiffs for Interests far exceeded the amounts that the Melancon Defendants paid for those Interests. Sonnier received, from one or more of the Melancon Defendants, a portion of the money paid by Plaintiffs to purchase Interests as a "finder's fee" to Sonnier for inducing Plaintiffs to make such purchases, and Sonnier, via Media/Right received additional monies from the Melancon Defendants out of the monies paid by Plaintiffs as a result of Sonnier's fraudulent mark-ups of the prices quoted to Sonnier by the Melancon Defendants.

(d)     the Interests that were actually sold to Plaintiffs were often purchased at a price that was greater than that represented, in royalty acreage that was less than that represented, and/or at a location different than that represented.

(e)     The term of the Interests in Louisiana was often sometimes less than 10 years (*i.e.*, the royalty would expire in less than 10 years unless there was a valid and existing oil and gas lease from which oil and/or gas was being produced in paying quantities) for Interests as to which Defendants had represented a 10-year term, and, for the Interests that were represented as having terms of less than 10 years, there sometimes was not imminent planned production that would be completed within such shortened term so that the Interests being acquired would be secured by production within such term.

41.     Plaintiffs would not have purchased the Interests from Defendants had Plaintiffs known that: (a) Sonnier and the Melancon Defendants would not be investing their own personal money, or money from related entities, on the basis that Defendants represented to Plaintiffs; (b) Plaintiffs were paying far more than the price paid by the Melancon Defendants; (c) Defendants were receiving substantial additional financial benefits from Plaintiffs' purchases, *i.e.*, they were making secret profits; (d) the Interests that were actually sold to Plaintiffs were often purchased at a price that was greater than that represented, in royalty acreage that was less than that represented, and/or at a location different than that represented; (e) the term of the Interests in Louisiana was sometimes less than 10 years, and, for the Interests that were represented as having terms of less than 10 years, there sometimes was not imminent planned production that would be completed within such shortened term so that the Interests being acquired would be secured by production within such term.

42.     Furthermore, Plaintiffs are informed and believe, and based thereon allege, that Sonnier has never been licensed to practice law.  Plaintiffs relied upon Sonnier's representations that he was a licensed attorney in making the investments alleged herein.  Had Plaintiffs known that Sonnier was not, and never has been, a licensed attorney, they would have sought independent legal advice concerning their purchases of the Interests and the administration thereof.

43.     As a result of Defendants' wrongful conduct inducing Plaintiffs to purchase Interests from the Melancon Defendants, Plaintiffs have incurred substantial losses in an amount to be proved at trial but that may approach $8 million, and Defendants have been unjustly enriched.

**D.** **The "Flip Properties."**

44.     Between about August 2009 and about October 2009, Schaffer purchased Interests in three sets of properties (the "Flip Properties") from the Melancon Defendants based on the representation by Defendants, through Sonnier, to Schaffer that they would be reselling them within a two- to four-month period, at a quick profit.

45.     Defendants, through Sonnier, represented at various times from August 2009 through October 2009 that Sonnier and the Melancon Defendants were each purchasing at least the same shares of Interests as Schaffer in the three sets of Flip Properties.  It was Schaffer's understanding that the Interests in the Flip Properties purchased with Schaffer's money would be titled in Schaffer's name and that such Interests would be purchased at the Melancon Defendants' actual purchase cost. The parties agreed that the first two Flip Properties would be purchased 25% by Schaffer, 25% by Sonnier, and 50% by the Melancon Defendants, and that the Melancon Defendants would receive 50% of any profits made by Schaffer or Sonnier.  The parties agreed that the third set of Flip Properties would be purchased 33.33% by Schaffer, 33.33% by Sonnier, and 33.33% by the Melancon Defendants, and that any profit made by Schaffer and Sonnier on the resale of the third set of Flip Properties to be purchased by Schaffer and Sonnier would be split 60% to Schaffer and 60% to Sonnier as to their purchases and 40% to the Melancon Defendants.

46.     Schaffer paid Defendants $194,500 for his share of the Interests in the first set of Flip Properties, through a payment of $100,000 made on August 13, 2009, a payment of $87,500 made on August 31, 2009, and a payment of $7,000 made on October 5, 2009 to reimburse Sonnier for a portion of Sonnier's investment in such Flip Property made on behalf of Schaffer.  Defendants told Schaffer that his first $100,000 payment would be used to purchase Interests located in Red River Parish, Louisiana for quick resale, but did not specify the acreage or provide a legal

description at the time of purchase.  Defendants also told Schaffer that his payment of $87,500 would, along with $80,000 in proceeds from the sale of an unspecified portion of the proceeds of the sale of Interests located in Red River Parish, Louisiana that was initially purchased with the $100,000 payment made on August 13, 2009, be used to purchase additional Interests of 40 acres in Caddo Parish, Louisiana.  As alleged more fully herein, Schaffer purchased Interests in this set of Flip Properties based upon the representations by Defendants alleged herein.

47.    On September 29, 2009, Schaffer paid Defendants $125,000 for his share of the Interests in the second set of Flip Properties.  Defendants told Schaffer that his payment would be used to purchase Interests in Red River Parish, Louisiana for quick resale, but did not specify the acreage or provide a legal description at the time of the purchase.  As alleged more fully herein, Schaffer purchased Interests in this set of Flip Properties based upon the representations by Defendants alleged herein.

48.    On October 23, 2009, Sonnier sent Schaffer an e-mail soliciting his purchase of a one-third share in Interests in 556.74 acres total (comprised of four specifically identified tracts of 321 acres, 87 acres, 67.74 acres, and 81 acres, respectively).  That e-mail asked Schaffer for "a capital contribution of $835,110.00 (1/3) payable to Pinnacle" for Schaffer's purchase of his one-third share (or 185.58 acres) of Interests in that acreage.  Sonnier told Schaffer that the four tracts "belong to one landowner who has been contacted by Petrohawk, Chesapeake, and Comstock to lease these tracts" and that "[t]hey have all offered $6,000.00/acre and ¼ royalty."  The e-mail stated that the landowner had told Defendants "that if we would show up with $4,500.00/acre in the form of a cashier's check that she would lease to us" and that "we should be able to flip this lease for $1,500.00/acre profit to which ever [sic] of the 3 companies pays us the $6,000.00/acre that they have offered to the landowner."

49.     In reliance upon these representations and the other representations alleged herein, Schaffer on October 29, 2009 wired the Melancon Defendants $835,110 to purchase a one-third share of the specified Interests in this third set of Flip Properties.

50.     Several months after the purchase of Interests in this third set of Flip Properties, ExxonMobil Corp. ("Exxon") acquired certain substantial gas production rights purportedly in the areas where Schaffer and Defendants had invested. Defendants, through Sonnier, induced Schaffer to consent to retention of the Interests in the Flip Properties based upon Melancon's assertion that he wanted to see the effect of Exxon's purchase on the market.

51.     In early 2011, when Schaffer was preparing his tax projection, Sonnier told Schaffer that Schaffer would have a large capital gain with regard to the Interests in this third set of Flip Properties.  Thereafter, Schaffer was informed by Sonnier that the Interests in this third set of Flip Properties had been sold to Exxon in late 2010 and that "they" had received their $835,000 back plus a "small" profit of approximately $1,500 per acre, plus a 1% override of whatever Exxon received from oil royalties.  Sonnier told Schaffer that Melancon had decided, without Schaffer's knowledge or consent, to forego the large cash gains from such purported sale and instead retained the override interest.

52.     In September 2011, Schaffer asked Sonnier for more specific information on the claimed sale to Exxon and for an accounting of the Flip Properties that had purportedly been bought and resold.  Sonnier told Schaffer that he did not need to worry about reporting the gain on his income taxes because the Interests in the Flip Properties had all been put in the name of Melancon's corporation, Pinnacle, and any reporting of income was in Pinnacle's name.

53.     Upon learning that title to the Interests in the Flip Properties had been placed in Pinnacle's name, Schaffer discussed his concerns with Sonnier.  Sonnier told Schaffer that he had similar concerns and that Melancon would provide

1   Schaffer and Sonnier with a document disclosing their entitlement to receive funds

2   from Pinnacle so that they would be protected in case something happened to

3   Melancon before the monies were distributed to them.  However, no such

4   documents were provided in spite of Schaffer's repetitive requests to Sonnier.

5   Sonnier told Schaffer that Melancon was busy and would provide the documents

6   late in 2011, when the industry would slow down and Melancon would have more

7   time.  The same delays, and the same excuse, continued into 2012.

8       54.     Although Schaffer had been asking for information on the Interests in

9   the Flip Properties periodically since late 2010, it was not until fall 2012 that

10  Melancon provided any documents that purportedly accounted for the disposition of

11  the Interests in the Flip Properties.  Those documents were incomprehensible not

12  only to Schaffer, but also to his advisor John Miller, a Certified Professional

13  Landman with in-depth knowledge of such matters.

14      55.     Beginning in early fall 2012 and continuing through mid-April 2013,

15  and only because SFI told Defendants that it would not purchase any additional

16  Interests from them if the requested information concerning the Flip Properties was

17  not provided, Defendants finally provided Schaffer information with regard to the

18  use of the moneys that he paid to purchase Interests in the Flip Properties.

19      56.     The documents and information provided to Schaffer in late March

20  2013 and mid-April 2013 indicated, *inter alia*, that: (a) the monies Schaffer paid to

21  purchase the Flip Properties were not used to purchase Interests in the specific

22  acreages and locations that had been presented to Schaffer at the time of his

23  purchases; (b) such funds had instead been used to purchase Interests in other

24  properties in other locations; (c) while Defendants have claimed that they sold the

25  Interests in the Flip Properties and used those proceeds to purchase various Interests

26  in such other properties, the Interests that were supposedly purchased with the

27  proceeds from the purported sale of the Interests were apparently purchased well

28  before the Interests in the Flip Properties were supposedly sold; (d) Schaffer

received Interests in 127.846 acres, rather than in 185.58 acres (one-third of 556.74 acres) as had been represented to Schaffer; (e) Schaffer was therefore charged $6,534 per acre, rather than the $4,500 per acre represented by Defendants at the time of purchase, and Schaffer was charged an extra fee of $19,050 that was never disclosed at the time of purchase and to which he did not agree; (f) many of the Interests had expired between October 2012 and February 2013, contrary to Defendants' assertion that no rights on any Interests had expired or were anticipated to expire; (g) the purchases were made in the name of Pinnacle, rather than in the name of Schaffer; (h) Defendants purported to have sold, for about $601,812.60, 87.182 acres of the Interests that they claimed to have purchased with proceeds from the sale of Schaffer's Interests in the third set of Flip Properties; (i) Defendants purported to have used Schaffer's proceeds from that sale to purchase, for $581,435.94, 186.50 acres of other Interests (but Plaintiffs are informed and believe, and based thereon allege, that there is no official record of any purchases of these Interests, or that Schaffer has any interest in such Interests); (j) Defendants represented that there was a "pending" sale of 35 acres of Interests to Petrohawk, but Defendants as of the date hereof have provided no information or sales proceeds as to such "pending" sale; and (k) Defendants did not account for five remaining acres of Interests that they said are owned by Schaffer.

57.     Schaffer did not authorize the purchases of Interests made by Defendants with the monies provided by Schaffer to purchase Interests in the third set of Flip Properties or with the proceeds from any sale of Schaffer's Interests in the third set of Flip Properties.

58.     Plaintiffs are informed and believe, and based thereon allege, that Defendants never purchased Interests in any of the Flip Properties as to which they sold Interests to Schaffer.

59.     Schaffer has never received back any portion of the money that he invested in the Interests in the Flip Properties, nor any return on those investments.

1   **E.     Failure to Provide Marketable Title.**

2       60.     Defendants agreed that, in the event they were unable to deliver

3   marketable title to Interests, they would refund the monies paid by Plaintiffs for

4   those Interests.

5       61.     Defendants did not deliver marketable title to certain of the Interests

6   they sold to Plaintiffs, including, *inter alia*, at least 13.96 royalty acres in South

7   Fulton Prospect sold to Plaintiffs on or about February 28, 2012.  However,

8   Defendants have not refunded the monies paid by Plaintiffs for those Interests.

9                           **FIRST CLAIM FOR RELIEF**

10                     **(for Federal Securities Law Violations**

11                   **Based upon Sale of Unregistered Securities,**

12                        **15 U.S.C. §§ 77e(a), 77***l***(a))**

13                        **(Against all Defendants)**

14      62.     Plaintiffs refer to paragraphs 1 through 61 of the Complaint, inclusive,

15  and incorporate them by reference as though set forth in full.

16      63.     Any fractional undivided Interests sold by Defendants to Plaintiffs (the

17  "Fractional Undivided Interests") constituted securities for purposes of the federal,

18  California, and Louisiana securities laws.

19      64.     In violation of 15 U.S.C. §§ 77e(a) and 77*l*(a), Defendants failed to

20  register the Fractional Undivided Interests sold to Plaintiffs as investment securities

21  as required by the Securities Exchange Act of 1933, and the subsequent offer and

22  sale of such Fractional Undivided Interests to Plaintiffs was therefore unlawful.  As

23  a result, Defendants are jointly and severally liable to Plaintiffs for any sale of such

24  Fractional Undivided Interests to Plaintiffs made one year or less prior to the filing

25  of this lawsuit on August 9, 2013.

26

27

28

**SECOND CLAIM FOR RELIEF**

**(for Federal Securities Law Violations**

**Based upon False Representations and Nondisclosures,**

**15 U.S.C. § 78j and 17 C.F.R. § 240.10b-5)**

**(Against all Defendants)**

65.     Plaintiffs refer to paragraphs 1 through 64 of the Complaint, inclusive, and incorporate them by reference as though set forth in full.

66.     Pursuant to 15 U.S.C. § 78j, the Securities & Exchange Commission (the "SEC") promulgated SEC Rule 10b-5, codified as 17 C.F.R. § 240.10b-5.  Rule 10b-5(a) prohibits the employment of any "device, scheme or artifice to defraud" in connection with the purchase or sale of a security.  17 C.F.R. § 240.10b-5(a).  Rule 10b-5(b) prohibits the offer or sale of securities by making "any untrue statement of fact" or "omit[ting] to state any material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).  Rule 10b-5(c) makes it unlawful to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5(c).

67.     Defendants carried out a plan, scheme, and course of conduct which was intended to, and did: (a) deceive Plaintiffs with regard to the value of the Fractional Undivided Interests offered to them by Defendants; and (b) cause Plaintiffs to purchase the Fractional Undivided Interests at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

68.     Defendants controlled each other, directly or indirectly, and engaged in their unlawful activities through or by means of each other, and they are each therefore jointly and severally liable under 15 U.S.C. §§ 78t(a) and (b).

69.     Defendants, through the false representations by Sonnier alleged herein, acting on his own behalf and as the agent of the Melancon Defendants, (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs in violation of 15 U.S.C. § 78j(b) and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5).  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons.

70.     Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to misrepresent the value of the Fractional Undivided Interests purchased by Plaintiffs.

71.     Defendants, through the false representations by Sonnier alleged herein, acting on his own behalf and as the agent of the Melancon Defendants, employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure Plaintiffs of the value of the Fractional Undivided Interests, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about the value of the Fractional Undivided Interests in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs as the purchasers of the Fractional Undivided Interests.

72.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such

facts were available to them.  Such material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of supporting the claimed inflated value of the Fractional Undivided Interests.  If any Defendant did not have actual knowledge of the misrepresentations and omissions alleged herein, he or it was reckless in failing to obtain such knowledge by deliberately refraining from taking the steps necessary to discover whether those statements were false or misleading.

73.     As a result of Defendants' dissemination of materially false and misleading information and failure to disclose material facts, as set forth above, the claimed market value of the Fractional Undivided Interests purchased by Plaintiffs was artificially inflated.  In ignorance of the fact that the claimed market value of the Fractional Undivided Interests was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed by Defendants to Plaintiffs, Plaintiffs acquired the Fractional Undivided Interests from Defendants at artificially high prices and were damaged because the Fractional Undivided Interests did not have the value represented by Defendants.

74.     At the time of said misrepresentations and omissions, Plaintiffs believed them to be true.  Had Plaintiffs known the truth regarding the Fractional Undivided Interests, Plaintiffs would not have purchased or otherwise acquired the Fractional Undivided Interests.

75.      At no time were Plaintiffs aware of the misrepresentations and omissions referenced herein.  Plaintiffs first became aware of the misrepresentations and omissions several months after August 13, 2012, the date of SFI's last purchase of Interests from the Melancon Defendants.  Plaintiffs' delay in discovering such misrepresentations and omissions was reasonable in light of, *inter alia*, the massive number of purchases (more than 100 Interests), the technicalities of the transactions,

and the unreasonable delay by Defendants in disclosing information and in giving Plaintiffs a complete accounting of the transactions (and such information, when provided, was frequently disorganized, incomplete, and incomprehensible), as well as in light of Plaintiffs' justifiable reliance upon Defendants' representations, the fiduciary duty owed to them by Sonnier as their agent, and the fiduciary duty owed by all Defendants to Plaintiffs as joint venturers.

76.    By virtue of the foregoing, Defendants have violated 15 U.S.C. § 78j and Rule 10b-5 promulgated thereunder.

77.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of the Fractional Undivided Interests in an amount to be proven at trial but that may approach $8 million.

78.    Based upon Defendants' violations of Rule 10b-5 alleged herein, Plaintiffs are entitled to rescission of their investments in the Fractional Undivided Interests, or in the alternative to damages, with interest accruing thereon at the legal rate.

79.    Defendants intentionally, willfully, and with malicious intent violated Rule 10b-5. They intentionally and fraudulently misrepresented the value of the Fractional Undivided Interests to be sold to Plaintiffs, all as part of an intentional plan to defraud Plaintiffs of an amount that ultimately approached $8 million. Consequently, Defendants are liable for punitive damages.

**THIRD CLAIM FOR RELIEF**

**(for California Securities Law Violations**

**Based upon Sale of Unregistered Securities,**

**Cal. Corp. Code §§ 25110, 25503)**

**(Against all Defendants)**

80.     Plaintiffs refer to paragraphs 1 through 79 of the Complaint, inclusive, and incorporate them by reference as though set forth in full.

81.     Defendants offered to sell and sold Plaintiffs, and Plaintiffs purchased from Defendants, the Fractional Undivided Interests for the amounts stated in Exhibits A and B attached hereto.

82.     Each Fractional Undivided Interest referenced herein is a security within the meaning of Cal. Corp. Code § 25019, by virtue of the fact that: (a) each Interest is a certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production under that title or lease; and/or (b) the transactions are investment contracts under California law.

83.     At the time of Plaintiffs' acquisition of each Fractional Undivided Interest referenced herein, each offer to sell and sale was subject to qualification, was not exempt from qualification, and was not qualified as any kind of securities transaction with the California Commissioner of Corporations; to the present date, none of the Fractional Undivided Interests has been qualified as any kind of securities transaction with the California Commissioner of Corporations.  Pursuant to Cal. Corp. Code § 25110, it was unlawful for Defendants to offer to sell or sell the Fractional Undivided Interests in the State of California unless such securities were qualified or exempted.

84.     At no time were Plaintiffs aware that the Fractional Undivided Interests may not have complied with the requirements of California law.  It was not until in or about April 2013 that Plaintiffs first became aware of Defendants' failure to

comply with Cal. Corp. Code § 25019, the ramifications thereof, and the remedies available as a result.

85.     As a result of the above-described acts, Defendants are liable to Plaintiffs, and pursuant to Cal. Corp. Code § 25503 Plaintiffs are entitled to, and hereby do, rescind the above-described purchases of Fractional Undivided Interests made two years or less prior to the filing of this lawsuit on August 9, 2013 (and therefore are entitled to recover the consideration Plaintiffs paid for the Fractional Undivided Interests with interest thereon at the legal rate, less the amount of any income received therefrom) and to recover damages to the extent that Plaintiffs no longer own such Fractional Undivided Interests (calculated as the difference between Plaintiffs' purchase price plus interest at the legal rate from the date of purchase, less the value of the Fractional Undivided Interests at the time they were disposed of by Plaintiffs plus the amount of any income received therefrom by Plaintiffs).

## FOURTH CLAIM FOR RELIEF

### (for California Securities Law Violations

### Based upon False Representations and Nondisclosures,

### Cal. Corp. Code §§ 25401, 25501)

### (Against all Defendants)

86.     Plaintiffs refer to paragraphs 1 through 85 of the Complaint, inclusive, and incorporate them by reference as though set forth in full.

87.     Defendants offered to sell and sold Plaintiffs, and Plaintiffs purchased from Defendants, the Fractional Undivided Interests for the amounts stated in Exhibits A and B attached hereto.

88.     These transactions were all accomplished by means of written and oral communications by Defendants, through the false representations by Sonnier alleged herein, acting on his own behalf and as the agent of the Melancon Defendants, to Plaintiffs in the State of California, which included untrue statements of material

32

facts and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in violation of Cal. Corp. Code § 25401, subjecting Defendants to liability under Cal. Corp. Code § 25501.  Plaintiffs purchased the Fractional Undivided Interests from Defendants in the State of California.  Said misrepresentations and omissions consisted of, among others, the following:

(a)    the purchase price to be paid by Plaintiffs for any Interests purchased from the Melancon Defendants would be the actual purchase cost paid by the Melancon Defendants (with regard to Schaffer's purchases of Interests prior to his purchase of Interests along with SFI) or the actual purchase cost paid by the Melancon Defendants plus three percent (3%) (with regard to SFI's purchases of Interests and Schaffer's purchases of Interests along with SFI);

(b)    Sonnier and the Melancon Defendants would each acquire and invest at least an equal amount of money in, Interests to be acquired by Schaffer or by both SFI and Schaffer, as is alleged in more detail above;

(c)    with the exception of the three percent (3%) mark-up charged by the Melancon Defendants on the purchase of Interests by SFI or by Schaffer along with SFI, there would be no other financial benefit to Schaffer, SFI, Melancon, or Sonnier, except for the benefit, shared jointly, of acquiring Interests on more favorable terms as a result of making combined purchases;

(d)    the Interests would be purchased at a specified price and in a specified number of royalty acres at a specified location (the Interests were sometimes invoiced with the locations to be provided at a later date); and

(e)     the term of the Interests in Louisiana would be 10 years
(*i.e.*, the royalty would expire in 10 years unless there was a valid and
existing oil and gas lease from which oil and/or gas was being
produced in paying quantities), unless the royalty was specifically
disclosed to expire in a shorter period, or, for Interests with terms of
less than 10 years, that there was imminent planned production that
would be completed within such shortened term so that the Interests
being acquired would be secured by production within such term.

89.     Contrary to the foregoing, the true facts were:

(a)     the purchase price paid by Plaintiffs for each Interest
purchased from the Melancon Defendants greatly exceeded the actual
purchase cost paid by the Melancon Defendants;

(b)     Sonnier and the Melancon Defendants did not acquire and
invest in Interests to be acquired by Schaffer or by both SFI and
Schaffer in the amounts alleged in more detail above, but instead sold
Plaintiffs most of the interests in the Interests, retaining little or no
financial interest in each Interest;

(c)     Defendants obtained a benefit from Plaintiffs' purchase of
Interests far in excess of the three percent (3%) mark-up charged by the
Melancon Defendants on the purchase of Interests by SFI and by
Schaffer along with SFI, including, *e.g.*, the extra amounts charged by
the Melancon Defendants and the monies that Sonnier received from
the Melancon Defendants as a "finder's fee" and, via Media/Right,
from the additional monies paid by Plaintiffs to the Melancon
Defendants as a result of Sonnier's fraudulent mark-ups of the prices
quoted to Sonnier by the Melancon Defendants;

(d)     the Interests that were actually sold to Plaintiffs were often
purchased at a price that was greater than that represented, in royalty

acreage that was less than that represented, and/or at a location different than that represented; and

(e)     the term of the Interests in Louisiana was sometimes less than 10 years (*i.e.*, the royalty would expire in less than 10 years unless there was a valid and existing oil and gas lease from which oil and/or gas was being produced in paying quantities), for leases that Defendants had not specifically disclosed would expire in a shorter period, and, for the Interests that were represented as having terms of less than 10 years, there sometimes was not imminent planned production that would be completed within such shortened term so that the Interests being acquired would be secured by production within such term.

90.     At no time were Plaintiffs aware of the misrepresentations and omissions referenced herein.  Plaintiffs first became aware of the misrepresentations and omissions several months after August 13, 2012, the date of SFI's last purchase of Interests from the Melancon Defendants.  Plaintiffs' delay in discovering such misrepresentations and omissions was reasonable in light of, *inter alia*, the massive number of purchases (more than 100 Interests), the technicalities of the transactions, and the unreasonable delay by Defendants in disclosing information and in giving Plaintiffs a complete accounting of the transactions (and such information, when provided, was frequently disorganized, incomplete, and incomprehensible), as well as in light of Plaintiffs' justifiable reliance upon Defendants' representations, the fiduciary duty owed to them by Sonnier as their agent, and the fiduciary duty owed by all Defendants to Plaintiffs as joint venturers.

91.     Defendants controlled each other, directly or indirectly, and engaged in their unlawful activities through or by means of each other, and they are each therefore jointly and severally liable under Cal. Corp. Code § 25504.

92.     As a result of the above-described acts, Defendants are liable to Plaintiffs, and pursuant to Cal. Corp. Code § 25501 Plaintiffs are entitled to, and hereby do, rescind the above-described purchases of Fractional Undivided Interests made five years or less prior to the filing of this lawsuit on August 9, 2013 (and therefore are entitled to recover the consideration Plaintiffs paid for the Fractional Undivided Interests with interest thereon at the legal rate, less the amount of any income received therefrom by Plaintiffs) and to recover damages to the extent that Plaintiffs no longer own such Fractional Undivided Interests (calculated as the difference between Plaintiffs' purchase price plus interest at the legal rate from the date of purchase, less the value of the Fractional Undivided Interests at the time they were disposed of by Plaintiffs, less the value of Fractional Undivided Interests at the time of purchase, not disposed of and presently owned by Plaintiffs, less the amount of any income received therefrom by Plaintiffs).

## FIFTH CLAIM FOR RELIEF

### (for Fraud)

### (Against all Defendants)

93.     Plaintiffs refer to paragraphs 1 through 92 of the Complaint, inclusive, and incorporate them by reference as though set forth in full.

94.     Plaintiffs' consent to the purchase of the Interests from Defendants was not real, mutual, or free in that it was obtained through misrepresentation as alleged herein.

95.     In order to induce Plaintiffs to purchase the Interests from Melancon, Defendants, through Sonnier, represented that:

(a)     the purchase price to be paid by Plaintiffs for any Interests purchased from the Melancon Defendants would be the actual purchase cost paid by the Melancon Defendants (with regard to Schaffer's purchases of Interests prior to his purchase of Interests along with SFI) or the actual purchase cost paid by the Melancon Defendants plus three

percent (3%) (with regard to SFI's purchases of Interests and Schaffer's purchases of Interests along with SFI);

(b)    Sonnier and the Melancon Defendants would each acquire and invest in each of Plaintiffs' purchases of Interests an amount of money as is alleged in more detail above;

(c)    with the exception of the three percent (3%) mark-up charged by the Melancon Defendants on the purchase of Interests by SFI or by Schaffer along with SFI, there would be no other financial benefit to Schaffer, SFI, Melancon, or Sonnier, except for the benefit, shared jointly, of acquiring Interests on more favorable terms as a result of making combined purchases;

(d)    the Interests would be purchased at a specified price and in a specified number of royalty acres at a specified location (the Interests were sometimes invoiced with the locations to be provided at a later date); and

(e)    the term of the Interests in Louisiana would be 10 years (*i.e.*, the royalty would expire in 10 years unless there was a valid and existing oil and gas lease from which oil and/or gas was being produced in paying quantities), unless the royalty was specifically disclosed to expire in a shorter period, or, for Interests with terms of less than 10 years, that there was imminent planned production that would be completed within such shortened term so that the Interests being acquired would be secured by production within such term.

96.    These representations were false when made.  The facts are that:

(a)    the purchase price paid by Plaintiffs for each Interest purchased from the Melancon Defendants greatly exceeded the Melancon Defendants' actual purchase cost;

(b)     Sonnier and the Melancon Defendants did not acquire and invest in Interests to be acquired by Schaffer or by both SFI and Schaffer in the amounts alleged in more detail above, but instead sold Plaintiffs most of the interests in the Interests, retaining little or no financial interest in each Interest;

(c)     Defendants obtained a benefit from Plaintiffs' purchase of Interests far in excess of the three percent (3%) mark-up charged by the Melancon Defendants on the purchase of Interests by SFI and by Schaffer along with SFI, including, *e.g.*, the extra amounts paid to the Melancon Defendants, and the monies that Sonnier received from the Melancon Defendants as a "finder's fee" and, via Media/Right, from the additional monies paid by Plaintiffs to the Melancon Defendants as a result of Sonnier's fraudulent mark-ups of the prices quoted to Sonnier by the Melancon Defendants;

(d)     the Interests that were actually sold to Plaintiffs were often purchased at a price that was greater than that represented, in royalty acreage that was less than that represented, and/or at a location different than that represented; and

(e)     the term of the Interests in Louisiana was sometimes less than 10 years (*i.e.*, the royalty would expire in less than 10 years unless there was a valid and existing oil and gas lease from which oil and/or gas was being produced in paying quantities) for leases that Defendants had not specifically disclosed would expire in a shorter period, and, for the Interests that were represented as having terms of less than 10 years, there sometimes was not imminent planned production that would be completed within such shortened term so that the Interests being acquired would be secured by production within such term.

97.     At the time that Defendants made these false representations, Defendants knew of the falsity of the representations.

98.     Plaintiffs reasonably relied upon these false representations in deciding to purchase the Interests from the Melancon Defendants.  Had Plaintiffs known the true facts, they would not have purchased the Interests from the Melancon Defendants.

99.     Because Defendants are fiduciaries of Plaintiffs, Plaintiffs are entitled to recover as damages for fraud not only their out-of-pocket losses, but also their benefit-of-the-bargain damages.  As a result of their reasonable reliance upon Defendants' false representations, Plaintiffs have suffered injury in an amount to be proven at trial but that may approach $8 million.

100.     At no time were Plaintiffs aware of the misrepresentations and omissions referenced herein.  Plaintiffs first became aware of the misrepresentations and omissions several months after August 13, 2012, the date of SFI's last purchase of Interests from the Melancon Defendants.  Plaintiffs' delay in discovering such misrepresentations and omissions was reasonable in light of, *inter alia*, the massive number of purchases (more than 100 Interests), the technicalities of the transactions, and the unreasonable delay by Defendants in disclosing information and in giving Plaintiffs a complete accounting of the transactions (and such information, when provided, was frequently disorganized, incomplete, and incomprehensible), as well as in light of Plaintiffs' justifiable reliance upon Defendants' representations, the fiduciary duty owed to them by Sonnier as their agent, and the fiduciary duty owed by all Defendants to Plaintiffs as joint venturers.

101.     The conduct of Defendants, and each of them, was done with a conscious disregard of Plaintiffs' rights and with the intent to vex, injure, or annoy Plaintiffs, such as to constitute oppression, fraud, malice, and despicable conduct under Cal. Civ. Code § 3294, entitling Plaintiffs to punitive damages in an amount appropriate to punish and set an example of Defendants.

1      102.   Plaintiffs would suffer substantial harm if the purchases of Interests are

2  not rescinded.

3      103.   Plaintiffs intend the service of the summons and Complaint in this

4  action to serve as notice of rescission of their purchases of the Interests, and hereby

5  demand that Defendants restore to Plaintiffs the consideration furnished by them,

6  specifically the nearly $8 million paid by Plaintiffs to Defendants to purchase the

7  Interests identified in Exhibits A and B hereto.

8      104.   Plaintiffs are entitled to a constructive trust as to the monies that they

9  paid Defendants as a result of Defendants' fraud, and all proceeds therefrom.

10  **SIXTH CLAIM FOR RELIEF**

11  **(for Breach of Fiduciary Duty – Joint Venturers)**

12  **(Against all Defendants)**

13      105.   Plaintiffs refer to paragraphs 1 through 104 of the Complaint, inclusive,

14  and incorporate them by reference as though set forth in full.

15      106.   Defendants, as putative joint venturers of Plaintiffs with regard to the

16  purchases to be made by Plaintiffs, Sonnier, and the Melancon Defendants, owed

17  Plaintiffs a fiduciary duty to act with due care and in the highest good faith and not

18  to obtain an improper advantage over them through any misconduct,

19  misrepresentation, or concealment.

20      107.   Defendants breached their fiduciary duties to Plaintiffs through the

21  conduct alleged herein with regard to the Interests that were the subject of the

22  putative joint venture, including, but not limited to: (a) obtaining from Plaintiffs a

23  purchase price for Interests purchased from the Melancon Defendants that greatly

24  exceeded the Melancon Defendants' actual purchase cost; and (b) failing to invest

25  and acquire an interest in any Interests to be acquired by Schaffer or by both SFI and

26  Schaffer in the amounts alleged in more detail above.

27      108.   The Melancon Defendants also breached their fiduciary duties to

28  Plaintiffs by paying Sonnier for inducing Plaintiffs to purchase Interests.

40

109.   As a direct and proximate result of Defendants' violation of their fiduciary duties to Plaintiffs, Plaintiffs have suffered injury in an amount to be proven at trial but that may approach $8 million.

110.   At no time were Plaintiffs aware of the breaches of fiduciary duty referenced herein.  Plaintiffs first became aware of the breaches of fiduciary duty several months after August 13, 2012, the date of SFI's last purchase of Interests from the Melancon Defendants.  Plaintiffs' delay in discovering such breaches of fiduciary duties was reasonable in light of, *inter alia*, the massive number of purchases (more than 100 Interests), the technicalities of the transactions, and the unreasonable delay by Defendants in disclosing information and in giving Plaintiffs a complete accounting of the transactions (and such information, when provided, was frequently disorganized, incomplete, and incomprehensible), as well as in light of Plaintiffs' justifiable reliance upon Defendants' representations, the fiduciary duty owed to them by Sonnier as their agent, and the fiduciary duty owed by all Defendants to Plaintiffs as joint venturers.

111.   The conduct of Defendants, and each of them, was done with a conscious disregard of Plaintiffs' rights and with the intent to vex, injure, or annoy Plaintiffs, such as to constitute oppression, fraud, malice, and despicable conduct under Cal. Civ. Code § 3294, entitling Plaintiffs to punitive damages in an amount appropriate to punish and set an example of Defendants.

112.   Plaintiffs are entitled to a constructive trust as to their share of the income received by the joint venture of Plaintiffs and Defendants, and all proceeds therefrom.

## SEVENTH CLAIM FOR RELIEF

### (for Breach of Fiduciary Duty – Agent)

### (Against Sonnier)

113.   Plaintiffs refer to paragraphs 1 through 112 of the Complaint, inclusive, and incorporate them by reference as though set forth in full.

114.   Sonnier, as Plaintiffs' agent, owed Plaintiffs a fiduciary duty to act with due care and in the highest good faith, not to obtain an improper advantage over them through any misconduct, misrepresentation, or concealment, and not to make secret profits for his own benefit from the subject matter of the agency.

115.   Sonnier breached his fiduciary duties to Plaintiffs through the conduct alleged herein, including, but not limited to: (a) advising Plaintiffs to purchase Interests that were priced far above the cost paid by the Melancon Defendants to acquire such Interests; (b) receiving payments for inducing Plaintiffs to purchase Interests from the Melancon Defendants; and (c) failing to administer Plaintiffs' purchases in a prudent manner.

116.   As a direct and proximate result of Sonnier's violation of his fiduciary duties to Plaintiffs, Plaintiffs have suffered injury in an amount to be proven at trial but that may approach $8 million.

117.    At no time were Plaintiffs aware of the breaches of fiduciary duty referenced herein.  Plaintiffs first became aware of the breaches of fiduciary duty several months after August 13, 2012, the date of SFI's last purchase of Interests from the Melancon Defendants.  Plaintiffs' delay in discovering such breaches of fiduciary duties was reasonable in light of, *inter alia*, the massive number of purchases (more than 100 Interests), the technicalities of the transactions, and the unreasonable delay by Defendants in disclosing information and in giving Plaintiffs a complete accounting of the transactions (and such information, when provided, was frequently disorganized, incomplete, and incomprehensible), as well as in light of Plaintiffs' justifiable reliance upon Defendants' representations, the fiduciary duty owed to them by Sonnier as their agent, and the fiduciary duty owed by all Defendants to Plaintiffs as joint venturers.

118.   Sonnier's conduct was done with a conscious disregard of Plaintiffs' rights and with the intent to vex, injure, or annoy Plaintiffs, such as to constitute oppression, fraud, malice, and despicable conduct under Cal. Civ. Code § 3294,

1   entitling Plaintiffs to punitive damages in an amount appropriate to punish and set

2   an example of Sonnier.

3       119.   Plaintiffs are entitled to disgorgement of, and a constructive trust as to,

4   any portion of their payments that was received by Sonnier from the Melancon

5   Defendants, and all proceeds therefrom.

6   **EIGHTH CLAIM FOR RELIEF**

7   **(for Breach of Written Contract – Purchases of Interests)**

8   **(Against all Defendants)**

9       120.   Plaintiffs refer to paragraphs 1 through 119 of the Complaint, inclusive,

10   and incorporate them by reference as though set forth in full.

11       121.   Each agreement pursuant to which Plaintiffs purchased Interests from

12   Defendants is a separate binding contract, founded upon an instrument in writing, e-

13   mails sent by Sonnier to Plaintiffs offering Interests for purchase by Plaintiffs.  Each

14   such agreement provided that:

15       (a)   the purchase price to be paid by Plaintiffs for any Interests

16       purchased from the Melancon Defendants would be the actual purchase

17       cost paid by the Melancon Defendants (with regard to Schaffer's

18       purchases of Interests prior to his purchase of Interests along with SFI)

19       or the actual purchase cost paid by the Melancon Defendants plus three

20       percent (3%) (with regard to SFI's purchases of Interests and Schaffer's

21       purchases of Interests along with SFI);

22       (b)   Sonnier and the Melancon Defendants would each acquire

23       and invest an amount of money in, Interests to be acquired by Schaffer

24       or by both SFI and Schaffer as is alleged in more detail above;

25       (c)   with the exception of the three percent (3%) mark-up

26       charged by the Melancon Defendants on the purchase of Interests by

27       SFI or by Schaffer along with SFI, there would be no other financial

28       benefit to Schaffer, SFI, Melancon, or Sonnier, except for the benefit,

43

shared jointly, of acquiring Interests on more favorable terms as a result of making combined purchases;

(d) the Interests would be purchased at a specified price and in a specified number of royalty acres at a specified location (the Interests were sometimes invoiced with the locations to be provided at a later date);

(e) the term of the Interests in Louisiana would be 10 years (*i.e.*, the royalty would expire in 10 years unless there was a valid and existing oil and gas lease from which oil and/or gas was being produced in paying quantities), unless the royalty was specifically disclosed to expire in a shorter period, or, for Interests with terms of less than 10 years, that there was imminent planned production that would be completed within such shortened term so that the Interests being acquired would be secured by production within such term; and

(f) in the event Defendants were unable to deliver marketable title to Interests, they would refund the monies paid by Plaintiffs for those Interests.

122. Defendants breached each agreement pursuant to which Plaintiffs purchased Interests from Defendants based upon one or more of the following grounds:

(a) the purchase price paid by Plaintiffs for each Interest purchased from the Melancon Defendants greatly exceeded the actual purchase cost paid by the Melancon Defendants;

(b) Sonnier and the Melancon Defendants did not acquire or invest in Interests to be acquired by Schaffer or by both SFI and Schaffer in the amounts alleged in more detail above, but instead sold Plaintiffs most of the interests in the Interests, retaining little or no financial interest in each Interest;

44

(c)   Defendants obtained a benefit from Plaintiffs' purchase of Interests far in excess of the three percent (3%) mark-up charged by the Melancon Defendants on the purchase of Interests by SFI and by Schaffer along with SFI, including, *e.g.*, the extra amounts charged by the Melancon Defendants, and the monies that Sonnier received from the Melancon Defendants as a "finder's fee" and, via Media/Right, from the additional monies paid by Plaintiffs to the Melancon Defendants as a result of Sonnier's fraudulent mark-ups of the prices quoted to Sonnier by the Melancon Defendants;

(d)   the Interests that were actually sold to Plaintiffs were often purchased at a price that was greater than that represented, in royalty acreage that was less than that represented, and/or at a location different than that represented;

(e)   the term of the Interests in Louisiana was sometimes less than 10 years (*i.e.*, the royalty would expire in less than 10 years unless there was a valid and existing oil and gas lease from which oil and/or gas was being produced in paying quantities), for leases that Defendants had not specifically disclosed would expire in a shorter period, and, for the Interests that were represented as having terms of less than 10 years, there sometimes was not imminent planned production that would be completed within such shortened term so that the Interests being acquired would be secured by production within such term; and

(f)   Defendants did not deliver marketable title to certain of the Interests they sold to Plaintiffs, but they have not refunded the monies paid by Plaintiffs for those Interests.

123.   As a direct and proximate result of Defendants' breach of their contractual obligations with regard to Plaintiffs' purchases of Interests, Plaintiffs

have suffered injury in an amount to be proven at trial but that may approach $8 million.

124.     At no time were Plaintiffs aware of the breaches of contract referenced in paragraph 122(a) – (c) above.  Plaintiffs first became aware of these breaches of contract several months after August 13, 2012, the date of SFI's last purchase of Interests from the Melancon Defendants.  Plaintiffs' delay in discovering such breaches of contract was reasonable in light of, *inter alia*, the massive number of purchases (more than 100 Interests), the technicalities of the transactions, and the unreasonable delay by Defendants in disclosing information and in giving Plaintiffs a complete accounting of the transactions (and such information, when provided, was frequently disorganized, incomplete, and incomprehensible), as well as in light of Plaintiffs' justifiable reliance upon Defendants' representations, the fiduciary duty owed to them by Sonnier as their agent, and the fiduciary duty owed by all Defendants to Plaintiffs as joint venturers.

## NINTH CLAIM FOR RELIEF

### (for Breach of Verbal Contract – Agency Agreement)

### (Against Sonnier)

125.     Plaintiffs refer to paragraphs 1 through 124 of the Complaint, inclusive, and incorporate them by reference as though set forth in full.

126.     The verbal agency agreement between Sonnier and Plaintiffs is a binding contract.

127.     Under the covenant of good faith and fair dealing implied into the verbal agency agreement and general principles of agency law, Sonnier had an obligation to look out for Plaintiffs' interests, not to profit at the expense of Plaintiffs, and to administer Plaintiffs' purchases in a prudent manner.

128.     Sonnier breached his contractual obligations by, among other things, inducing Plaintiffs to purchase Interests at grossly inflated prices, failing to

1  administer Plaintiffs' purchases in a prudent manner, and by receiving payments

2  from the Melancon Defendants for inducing Plaintiffs to make such purchases.

3      129.   As a direct and proximate result of Sonnier's breach of his contractual

4  obligations under the verbal agency agreement, Plaintiffs have suffered injury in an

5  amount to be proven at trial but that may approach $8 million.

6      130.   At no time were Plaintiffs aware of the breaches of contract referenced

7  herein.  Plaintiffs first became aware of these breaches of contract several months

8  after August 13, 2012, the date of SFI's last purchase of Interests from the Melancon

9  Defendants.  Plaintiffs' delay in discovering such breaches of contract was

10 reasonable in light of, *inter alia*, the massive number of purchases (more than 100

11 Interests), the technicalities of the transactions, and the unreasonable delay by

12 Defendants in disclosing information and in giving Plaintiffs a complete accounting

13 of the transactions (and such information, when provided, was frequently

14 disorganized, incomplete, and incomprehensible), as well as in light of Plaintiffs'

15 justifiable reliance upon Defendants' representations, the fiduciary duty owed to

16 them by Sonnier as their agent, and the fiduciary duty owed by all Defendants to

17 Plaintiffs as joint venturers.

18                        **TENTH CLAIM FOR RELIEF**

19              **(for Intentional Interference with Contractual Relations)**

20                     **(Against the Melancon Defendants)**

21     131.   Plaintiffs refer to paragraphs 1 through 130 of the Complaint, inclusive,

22 and incorporate them by reference as though set forth in full.

23     132.   The verbal agency agreement between Sonnier and Plaintiffs is a

24 binding contract.

25     133.   The Melancon Defendants were aware of the verbal agency agreement

26 between Sonnier and Plaintiffs.

27     134.   Within two years prior to the filing of this lawsuit on August 9, 2013,

28 the Melancon Defendants intentionally engaged in conduct that was designed to

47

1  disrupt the verbal agency agreement between Sonnier and Plaintiffs.  In particular,

2  the Melancon Defendants induced Sonnier to breach the obligations that he owed

3  Plaintiffs as their agent to look out for Plaintiffs' interests, not to profit at the

4  expense of Plaintiffs, and to administer Plaintiffs' investments in a prudent manner.

5  135.   As a direct and proximate result of the Melancon Defendants' wrongful

6  acts, Plaintiffs' contractual relationship with Sonnier has been disrupted in that

7  Sonnier breached his contractual obligations by, among other things, inducing

8  Plaintiffs to purchase Interests at grossly inflated prices, failing to administer

9  Plaintiffs' purchases in a prudent manner, and by receiving payments from the

10  Melancon Defendants for inducing Plaintiffs to make such purchases.

11  136.   As a direct and proximate result of the wrongful acts of the Melancon

12  Defendants inducing Sonnier to breach his contractual duties to Plaintiffs, Plaintiffs

13  have suffered injury in an amount to be proven at trial but that may approach $8

14  million.

15  137.   The Melancon Defendants' conduct was done with a conscious

16  disregard of Plaintiffs' rights and with the intent to vex, injure, or annoy Plaintiffs,

17  such as to constitute oppression, fraud, malice, and despicable conduct under Cal.

18  Civ. Code § 3294, entitling Plaintiffs to punitive damages in an amount appropriate

19  to punish and set an example of the Melancon Defendants.

**ELEVENTH CLAIM FOR RELIEF**

**(for Statutory Unfair Competition,**

**Cal. Bus. & Prof. Code §§ 17200 *et seq.*)**

**(Against all Defendants)**

24  138.   Plaintiffs refer to paragraphs 1 through 137 of the Complaint, inclusive,

25  and incorporate them by reference as though set forth in full.

26  139.   Within four years prior to the filing of this lawsuit on August 9, 2013,

27  Defendants, by doing the acts alleged herein, have violated (a) 15 U.S.C. §§ 77e(a),

28  78*l*(a)*,* and 78j; (b) 17 C.F.R. § 240.10b-5; and (c) Cal. Corp. Code §§ 25110 and

48

25401, and they have engaged in unlawful, unfair, and fraudulent business practices constituting statutory unfair competition in violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.*

140.   By means of Defendants' unlawful, unfair, and fraudulent business practices in violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.*, Defendants have acquired money from Plaintiffs.

141.   Pursuant to Cal. Bus. & Prof. Code § 17203, the Court should enter a judgment as necessary to restore to Plaintiffs the monies that Defendants have acquired by means of such unfair competition.

## TWELFTH CLAIM FOR RELIEF

### (for an Accounting)

### (Against all Defendants)

142.   Plaintiffs refer to paragraphs 1 through 141 of the Complaint, inclusive, and incorporate them by reference as though set forth in full.

143.   Plaintiffs are entitled to an accounting with regard to Plaintiffs' Interests, including, *inter alia*, Defendants' receipt of monies from Plaintiffs and their use of such monies by Defendants, payments to the Melancon Defendants for Melancon to purchase each Interest, the location, size, and legal description of each purchase of any Interests (for each actual purchase, and as compared to the location, size, and legal description for which the Melancon Defendants invoiced Plaintiffs in connection with the original purchase of the Interests), the amount of money each Defendant invested in each Interest that was purchased by Plaintiffs, how title was taken for each of Plaintiffs' purchases, all documents reflecting transfers of title to the Interests (including copies of all valid assignments to Plaintiffs of the Interest purchased by Plaintiffs), and for any Interests sold by Defendants, a description of what was sold, the amount of money received from any such resale, and an accounting of the disposition of proceeds of any such resale.

144.   Defendants have received and possess money due to Plaintiffs with regard to Plaintiffs' Interests.  The amount of money due to Plaintiffs is unknown and cannot be determined without a complete accounting with regard to the Interests.

145.   Plaintiffs have on frequent occasions requested an accounting from Defendants with regard to the Interests purchased by Plaintiffs.  Defendants have failed to provide a meaningful response to these requests.

### THIRTEENTH CLAIM FOR RELIEF

**(for Louisiana Securities Law Violations**

**Based upon Sale of Unregistered Securities,**

**La. Rev. Stat. §§ 51:714, 51:712(A)(1), 51:705)**

**(Against all Defendants)**

146.   Plaintiffs refer to paragraphs 1 through 145 of the Complaint, inclusive, and incorporate them by reference as though set forth in full.

147.   Defendants offered Plaintiffs, and Plaintiffs purchased from Defendants, the Fractional Undivided Interests for the amounts stated in Exhibits A and B attached hereto.

148.   Each Fractional Undivided Interest referenced herein is a security within the meaning of La. Rev. Stat. § 51:702(15)(a) as a "fractional undivided interest in oil, gas, or other mineral rights."

149.   At the time of Plaintiffs' acquisition of each Fractional Undivided Interest referenced herein, each sale was subject to qualification, was not exempt from qualification, and was not qualified as any kind of securities transaction with the Louisiana Commissioner of Financial Institutions; to the present date, none of the Fractional Undivided Interests has been qualified as any kind of securities transaction with the Louisiana Commissioner of Financial Institutions.  Pursuant to La. Rev. Stat. §§ 51:705 and 51:7012(A)(1), it was unlawful for Defendants to offer

or sell the Fractional Undivided Interests from the State of Louisiana unless such securities were qualified or exempted.

150.   At no time were Plaintiffs aware that the Fractional Undivided Interests may not have complied with the requirements of Louisiana law.  It was not until in or about April 2013 that Plaintiffs first became aware of Defendants' failure to comply with La. Rev. Stat. § 51:705, the ramifications thereof, and the remedies available as a result.

151.   As a result of these violations, Defendants are liable to Plaintiffs under La. Rev. Stat. § 51:714(A), and Plaintiffs are entitled to recover the consideration paid in cash, with interest thereon from the date of payment down to the date of repayment, less the amount of any income received thereon, together with all taxable court costs and reasonable attorneys' fees.

## FOURTEENTH CLAIM FOR RELIEF

### (for Louisiana Securities Law Violations

### Based upon False Representations and Nondisclosures,

### La. Rev. Stat. §§ 51:714, 51:712(A)(2), 51:712(D))

### (Against all Defendants)

152.   Plaintiffs refer to paragraphs 1 through 151 of the Complaint, inclusive, and incorporate them by reference as though set forth in full.

153.   La. Rev. Stat. § 51:712(A)(2) prohibits an offer to sell or the sale of a security by means of any oral or written untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, if such person in the exercise of reasonable care could not have known of the untruth or the omission.  *Id.*

154.   La. Rev. Stat. § 51:712(D)(1) prohibits the employment of any "device, scheme or artifice to defraud" in connection with the purchase or sale of a security. *Id.*

155.   La. Rev. Stat. § 51:712(D)(2) makes it unlawful to "engage in any transaction, act, practice, or course of business which operates or would operate as a fraud or deceit upon" the purchaser or seller in connection with the purchase or sale of any security. *Id.*

156.   Defendants carried out a transaction, plan, scheme, and course of conduct which was intended to, and did: (a) deceive Plaintiffs with regard to the value of the Fractional Undivided Interests offered to them by Defendants; and (b) cause Plaintiffs to purchase the Fractional Undivided Interests at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.  Defendants controlled each other, directly or indirectly, and engaged in their unlawful activities through or by means of each other, and they are each therefore jointly and severally liable under La. Rev. Stat. § 51:714(B).

157.   Defendants, through the false representations by Sonnier alleged herein, acting on his own behalf and as the agent of the Melancon Defendants, (a) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; (b) employed devices, schemes, and artifices to defraud; and (c) engaged in transactions, acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs in violation of La. Rev. Stat. §§ 51:712(A)(2) and 51:712(D).  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons.

158.   Defendants, individually and in concert, directly and indirectly engaged and participated in a continuous course of conduct to misrepresent the value of the Fractional Undivided Interests.

159.   Defendants controlled each other, directly or indirectly, and engaged in their unlawful activities through or by means of each other, and they are each therefore jointly and severally liable under La. Rev. Stat. §§ 51:714(B).

160.   Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure Plaintiffs of the value of the Fractional Undivided Interests, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about the value of the Fractional Undivided Interests in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs as the purchasers of the Fractional Undivided Interests.

161.   Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of supporting the claimed inflated value of the Fractional Undivided Interests.  If any Defendant did not have actual knowledge of the misrepresentations and omissions alleged herein, he or it was reckless in failing to obtain such knowledge by deliberately refraining from taking the steps necessary to discover whether those statements were false or misleading.

162.   As a result of Defendants' dissemination of materially false and misleading information and failure to disclose material facts, as set forth above, the claimed market value of the Fractional Undivided Interests purchased by Plaintiffs was artificially inflated.  In ignorance of the fact that the claimed market value of the Fractional Undivided Interests was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, and/or on the absence of material adverse information that was known to or recklessly disregarded

by Defendants but not disclosed by Defendants to Plaintiffs, Plaintiffs acquired the Fractional Undivided Interests from Defendants at artificially high prices and were damaged because the Fractional Undivided Interests did not have the value represented by Defendants.

163.   At the time of said misrepresentations and omissions, Plaintiffs believed them to be true.  Had Plaintiffs known the truth regarding the Fractional Undivided Interests, Plaintiffs would not have purchased or otherwise acquired the Fractional Undivided Interests.

164.   At no time were Plaintiffs aware of the misrepresentations and omissions referenced herein.  Plaintiffs first became aware of the misrepresentations and omissions several months after August 13, 2012, the date of SFI's last purchase of Interests from the Melancon Defendants.  Plaintiffs' delay in discovering such misrepresentations and omissions was reasonable in light of, *inter alia*, the massive number of purchases (more than 100 Interests), the technicalities of the transactions, and the unreasonable delay by Defendants in disclosing information and in giving Plaintiffs a complete accounting of the transactions (and such information, when provided, was frequently disorganized, incomplete, and incomprehensible), as well as in light of Plaintiffs' justifiable reliance upon Defendants' representations, the fiduciary duty owed to them by Sonnier as their agent, and the fiduciary duty owed by all Defendants to Plaintiffs as joint venturers.

165.   By virtue of the foregoing, Defendants have violated La. Rev. Stat. §§ 51:712(A)(2) and 51:712(D).

166.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of the Fractional Undivided Interests in an amount to be proven at trial but that may approach $8 million.

167.   At no time were Plaintiffs aware of the misrepresentations and omissions referenced herein.  Plaintiffs first became aware of the misrepresentations

1    and omissions several months after August 13, 2012, the date of SFI's last purchase
2    of Interests from the Melancon Defendants.  Plaintiffs' delay in discovering such
3    misrepresentations and omissions was reasonable in light of, *inter alia*, the massive
4    number of purchases (more than 100 Interests), the technicalities of the transactions,
5    and the unreasonable delay by Defendants in disclosing information and in giving
6    Plaintiffs a complete accounting of the transactions (and such information, when
7    provided, was frequently disorganized, incomplete, and incomprehensible), as well
8    as in light of Plaintiffs' justifiable reliance upon Defendants' representations, the
9    fiduciary duty owed to them by Sonnier as their agent, and the fiduciary duty owed
10   by all Defendants to Plaintiffs as joint venturers.

11        168.   As a result of these violations, Defendants are liable to Plaintiffs under
12   La. Rev. Stat. § 51:714(A), and Plaintiffs are entitled to recover the consideration
13   paid in cash, with interest thereon from the date of payment down to the date of
14   repayment, less the amount of any income received thereon, together with all
15   taxable court costs and reasonable attorneys' fees.

16        169.   Defendants intentionally, willfully, and with malicious intent violated
17   the Louisiana securities laws.  They intentionally and fraudulently misrepresented
18   the value of the Fractional Undivided Interests to be sold to Plaintiffs, all as part of
19   an intentional plan to defraud Plaintiffs of an amount that ultimately approached $8
20   million.  Consequently, Defendants are liable for punitive damages.

## PRAYER

21
22        WHEREFORE, plaintiffs Schaffer Family Investors, LLC and Robert
23   Schaffer pray for judgment as follows:

24        1.    For rescission of all of Plaintiffs' purchases of Interests,
25   and for return to Plaintiffs of all monies paid in connection with such
26   purchases, in an amount to be proven at trial;

27        2.    For compensatory damages of $8 million, or in an amount
28   to be proven at trial;

55

3.  For a constructive trust over all monies acquired by Defendants from Plaintiffs, and all proceeds therefrom;

4.  For disgorgement of the monies acquired by Defendants from Plaintiffs;

5.  For an accounting from Defendants with regard to the Interests purchased by Plaintiffs;

6.  For an Order awarding Plaintiffs all monies found due as a result of the accounting;

7.  For prejudgment interest at the maximum rate allowed by law;

8.  For punitive and exemplary damages in an amount sufficient to punish Defendants and set an example;

9.  For Plaintiffs' costs of suit herein;

10.  For reasonable attorneys' fees to the extent allowed by statute including, but not limited to, pursuant to La. Rev. Stat. § 51:714(A);

11.  For costs of consultants, investigations, and discovery as necessary to mitigate damages resulting from Plaintiffs' wrongful conduct; and

1           12.    For such other and further relief as the Court deems just

2     and proper.

3

4     DATED: November 4, 2013    McKENNA LONG & ALDRIDGE LLP
                                Jeffrey D. Wexler
5                               Raymond O. Aghaian
                                Jenifer Seigle
6

7

8                                     By: _Raymond O. Aghaian (by JGW)_

9                                       Raymond O. Aghaian
                                Attorneys for Plaintiffs Schaffer Family
10                              Investors. LLC and Robert Schaffer

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## DEMAND FOR JURY TRIAL

2     Plaintiffs Schaffer Family Investors, LLC and Robert Schaffer demand trial

3   by jury on all issues triable at law.

4

5   DATED: November 4, 2013      McKENNA LONG & ALDRIDGE LLP
                                 Jeffrey D. Wexler
6                                Raymond O. Aghaian
                                 Jennifer Seigle
7

8

9                              By: _Raymond O. Aghaian (ぢ/0h/)_____

10                                Raymond O. Aghaian
                                  Attorneys for Plaintiffs Schaffer Family
11                                Investors. LLC and Robert Schaffer

12

13

14

15

16   USW 804014078.1

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

EXHIBIT "A"

## INTERESTS PURCHASED BY ROBERT SCHAFFER

| Acquisition Date | Amount Paid | Check No. / Wire Transfer | Check / Wire Transfer Date | Represented Prospect Name / Property Location |
|---|---|---|---|---|
| | $36,000.00 | 1723 | 1/9/2009 | Lafayette Parish, Louisiana, T9S-R3E, Section 25 |
| | $17,000.00 | 1732 | 2/17/2009 | Haynesville Prospect in Bossier Parish, Louisiana, T17N-R11W, Section 4 |
| | $8,400.00 | 1740 | 3/15/2009 | Calcasieu Parish, Louisiana, T9S-R12W, Section 11 |
| | $100,000.00 | 101 | 8/13/2009 | Sabine Parish, T8N-R13W, Section 34 |
| | $87,500.00 | 103 | 8/31/2009 | Sabine Parish, Louisiana, T9N-R12W, Section 19 |
| | $24,000.00 | 1686 | 9/29/2008 | Red River Parish, T14N-R9W, Section 26; T14N-R9W, Section 1; T12N-R9W, Section 19 & 36; T14N-R9W, Section 24 |
| | $125,000.00 | 104 | 9/29/2009 | Red River Parish, Louisiana |
| | $7,000.00 | 110 | 10/5/2009 | Sabine Parish, Louisiana, T10N-R14W, Section 21 |
| | $835,110.00 | Wire transfer | 10/25/2009 | Sabine Parish, no legal description provided (185.58) acres |
| | $78,200.00 | 102 | 6/1/2010 | Red River with some oil shale overlay in Bossier Parish. Louisiana |
| | $31,500.00 | 102 | 9/17/2010 | Allen Parish, Louisiana; no legal description provided |
| | $78,000.00 | 1011 | 4/15/2011 | Granite Wash Prospect, Oklahoma; no legal description provided |
| | $150,000.00 | 1016 | 6/13/2011 | Allen Parish, Louisiana, T6S-R4W, Section 18 |
| | $94,000.00 | 1017 | 7/29/2011 | Beauregard Parish, Louisiana – no legal description provided |
| | $47,000.00 | 105 | 8/28/2011 | Beauregard Parish, Louisiana – no legal description provided |
| | $143,000.00 | 110 | 9/19/2011 | Beauregard Parish and Vernon Parish, Louisiana |
| | $137,000.00 | 111 | 9/23/2011 | Jefferson County, Texas |
| | $141,500.00 | 117 | 1/17/2012 | Eagle Ford Shale |
| 7/22/2008 | $9,100.00 | 1664 | 7/21/2008 | Haynesville Prospect, Desoto Parish, Louisiana, T14N-R14W, Section 30 |

1

2

| Acquisition Date | Amount Paid | Check No./Wire Transfer | Check/Wire Transfer Date | Represented Prospect Name/Property Location |
|---|---|---|---|---|
| 7/22/2008 | " " | 1664 | 7/21/2008 | Haynesville Prospect, Bossier Parish, Louisiana, T17N-R11W, Section 9 |
| 8/8/2008 | $42,375.00 | 1669 | 8/7/2008 | Haynesville Prospect, Caddo Parish, Louisiana, T15N-R16W, Section 32; T16N-R15W, Section 6 |
| 8/8/2008 | " " | 1669 | 8/7/2008 | Haynesville Prospect and Jurassic Prospect, Desoto Parish, Louisiana, T16N-R14W, Section 36; T11N-R13W, Section 25 |
| 8/14/2008 | " " | 1669 | 8/7/2008 | Haynesville Prospect, Desoto Parish, Louisiana, T13N-R13W, Sections 18, 20 |
| 9/23/2008 | $56,000.00 | 1679 | 9/18/2008 | Haynesville Prospect, Webster Parish, Louisiana, T17N-R9W, Section 33; T18N-R10W, Section 23; T17N-R10W, Section 17 |
| 10/15/2008 | $90,100.00 | 1692 | 10/14/2008 | Haynesville Prospect, Red River Parish, Louisiana, T13N-R10W, Section 21; T13N-R9W, Section 35; T13N-R9W, Section 35 |
| 10/15/2008 | " " | 1692 | 10/14/2008 | Haynesville Prospect, Desoto Parish, Louisiana, T16N-R14W, Section 36; T11N-R13W, Section 25 |
| 10/15/2008 | " " | 1692 | 10/14/2008 | Haynesville Prospect and Cotton Valley Prospect, Desoto Parish, Louisiana, T12N-R16W, Section 11 |
| 10/15/2008 | " " | 1692 | 10/14/2008 | Haynesville Prospect, Red River Parish, Louisiana, T12N-R8W, Section 29; T14N-R9W, Section 20 |
| 10/20/2008 | " " | 1692 | 10/14/2008 | Haynesville Prospect, Red River Parish, Louisiana, T14N-R0W, Sections 12, 26 |
| 10/27/2008 | $5,000.00 | 1694 | 10/19/2008 | Lafourche Parish, Louisiana, T19S-R21E, Section 24 |
| 11/4/2008 | $11,600.00 | 1702 | 11/3/2008 | Haynesville Prospect, Sabine Parish, Louisiana, T9N-R11W, Section 29 |
| 11/24/2008 | $34,800.00 | 1705 | 11/19/2008 | Haynesville Prospect, Red River Parish, Louisiana, T13N-R10W, Section 22 |
| 11/24/2008 | " " | 1705 | 11/19/2008 | Haynesville Prospect, Red River Parish, Louisiana, T14N-R9W, Section 20 |

3

| Acquisition Date | Amount Paid | Check No. / Wire Transfer | Check / Wire Transfer Date | Represented Prospect Name / Property Location |
|---|---|---|---|---|
| 11/24/2008 | " " | 1705 | 11/19/2008 | Haynesville Prospect, Red River Parish, Louisiana, T13N-R8W, Section 29 |
| 12/8/2008 | $12,666.67 | 1710 | 12/5/2008 | Haynesville Prospect, Desoto Parish, Louisiana, T11N-R15W, Section 22; T12N-R13W, Section 30 |
| 1/7/2009 | $17,000.00 | 1712 | 12/18/2008 | Haynesville Prospect, Desoto Parish, Louisiana, T15N-R14W, Section 1 |
| 1/7/2009 | $18,000.00 | 1724 | 1/9/2009 | Haynesville Prospect, Caddo Parish, Louisiana, T16N-R14W, Section 21 |
| 2/12/2009 | $43,500.00 | 1727 | 1/27/2009 | Haynesville Prospect in Bossier Parish, Louisiana, T17N-R11W, Section 4 |
| 3/18/2009 | $25,200.00 | 1738 | 3/6/2009 | Edgerly Prospect, Calcasieu Parish, Louisiana, T9S-R12W, Section 11 |
| 3/18/2009 | $22,500.00 | 1743 | 3/23/2009 | Edgerly Prospect, Calcasieu Parish, Louisiana, T9S-R12W, Section 11 |
| 4/9/2009 | $27,000.00 | 1747 | 4/5/2009 | Haynesville Prospect, Desoto Parish, Louisiana, T12N-R13W, Section 29 |
| 4/23/2009 | $18,800.00 | 1006 | 4/18/2009 | Haynesville Prospect, Desoto Parish, Louisiana, T12N-R13W, Sections 28, 33, 34 |
| 5/12/2009 | $18,800.00 | 1007 | 5/9/2009 | Haynesville Prospect, Desoto Parish, Louisiana, T14N-R13W, Section 29 |
| 6/5/2009 | $72,000.00 | 108 | 6/18/2009 | Haynesville Prospect, Desoto Parish, Louisiana, T13N-R13W, Section 4 |
| 6/29/2009 | " " | 108 | 6/18/2009 | Haynesville Prospect, Caddo Parish, Louisiana, T16N-R16W, Sections 26, 35, 36 |
| 8/1/2009 | $28,500.00 | 1009 | 5/21/2009 | Haynesville Prospect, Caddo Parish, Louisiana, T15N-R16W, Section 12 |
| 10/25/2009 | $59,450.00 | 106 | 11/10/2009 | Haynesville Prospect, Caddo Parish, Louisiana, T15N-R15W, Sections 17, 18 |
| 10/25/2009 | " " | 106 | 11/10/2009 | Haynesville Prospect, Desoto Parish, Louisiana, T13N-R12W, Section 29 |

| Acquisition Date | Amount Paid | Check No. / Wire Transfer | Check / Wire Transfer Date | Represented Prospect Name / Property Location |
|---|---|---|---|---|
| 11/17/2009 | $106,000.00 | 107 | 11/24/2009 | Haynesville Prospect, Red River Parish, Louisiana, T13N-R9W, Section 24 |
| 11/17/2009 | " " | 107 | 11/24/2009 | Haynesville Prospect in Caddo Parish, Louisiana, T15N-R16W, Section 1 |
| 11/17/2009 | " " | 107 | 11/24/2009 | Haynesville Prospect, Bienville Parish, Louisiana, T16N-R9W, Section 28 |
| 11/17/2009 | " " | 107 | 11/24/2009 | Haynesville Prospect in Caddo Parish, Louisiana, T16N-R15W, Sections 35 and 36 |
| 11/17/2009 | " " | 107 | 11/24/2009 | Haynesville Prospect in Caddo Parish, Louisiana, T16N-R15W, Section 7 |
| 3/10/2010 | $78,200.00 | 102 | 3/16/2010 | Haynesville Prospect, Sabine Parish, Louisiana, T9HN-R13W, Section 13; T9N-R11W, Section 3 |
| 4/28/2010 6/3/2010 3/2/2011 | $249,999.00 | Wire transfer from Centennial Bank | 11/25/2009 | Bakken Prospect, Roosevelt County, Montana, T29N-R49E, T28N-R50E, T29N-R50E, T27N-51E, T28N-51E with multiple sections in each Township-Range |
| 5/20/2011 | $24,000.00 | 133 | 6/1/2011 | Haynesville Prospect in Red River Parish, Louisiana, T12N-10W, Section 35 |
| 7/1/2010 | $65,000.00 | 100 | 7/29/2010 | Haynesville Prospect in Desoto Parish, Louisiana, T14N-R15W, Section 35 |
| 7/19/2010 | $63,000.00 $139,500.00 $283,500.00 | 101 1003 1004 | 6/10/2010 6/29/2010 7/13/2010 | Anadarko / Austin Chalk Prospect, Vemon Parish, Louisiana, T1S-R11W, Sections 31, 32; T2S-R11W, Sections 8, 23 |
| 8/19/2010 | $84,600.00 | 1002 | 8/14/2010 | South Perry Prospect, Vermilion Parish, Louisiana, T13S-R3E, Section 15 |
| 9/23/2010 | $127,500.00 | 1004 | 9/23/2010 | Haynesville Prospect in Red River Parish, Louisiana, T12N-9W, Section 22 |
| 9/29/2010 | " " | 1004 | 9/23/2010 | Haynesville Prospect in Sabine Parish, Louisiana, T9N-R13W, Section 24 |
| 11/8/2010 | $52,000.00 | 102 | 11/9/2010 | Caddo Parish, T15N-R15W, Section 7 |
| 11/8/2010 | " " | 102 | 11/9/2010 | Haynesville Prospect in Desoto Parish, Louisiana, T11N-R13W, Section 14; |

4

| Acquisition Date | Amount Paid | Check No./Wire Transfer | Check/Wire Transfer Date | Represented Prospect Name/Property Location |
|---|---|---|---|---|
| 11/12/2010 | $30,000.00 | 1006 | 11/18/2010 | Opelousas Prospect, St. Landry Parish, Louisiana, T6S-R4E, Sections 116, 117 |
| 11/15/2010 | $216,000.00 | 96 | 10/25/2010 | Austin Chalk Prospect, Vernon Parish, Louisiana, T2S-R11W, Sections 2, 12 |
| 11/23/2010 | $24,000.00 | 101 | 3/11/2011 | Erath Prospect, Vermilion Parish, Louisiana, T13S-R4E, Sections 32, 33 |
| 2/1/2011 | $91,000.00 | 101 | 9/8/2010 | Niobrara Shale, Laramie County, Wyoming; Weld County, Colorado; T10N-R60W; T9N-R62W; T15N-R62W; T13N-R63W; T14N-R63W; T11N-R64W; T19N-R66W - multiple sections in the above |
| 3/8/2011 | $210,000.00 | 107 | 12/10/2010 | Samson Lonestar, Galveston County, Texas |
| 3/16/2011 | $21,075.00 | 1005 | 3/11/2011 | Leleux Prospect, Vermilion Parish, Louisiana, T11S-R1E, Section 33 |
| 3/16/2011 | " " | 1005 | 3/11/2011 | Houma Prospect, Terrebonne Parish, Louisiana, T17S-R18E, Section 26 |
| 3/16/2011 | $43,400.00 | 1004 | 2/2/2011 | Lawtell Prospect, St. Landry Parish, Louisiana, T6S-R3E, Sections 21, 28, 29 |
| 3/28/2011 | $27,500.00 | 112 | 1/17/2012 | Cordillera Energy Prospect, Roger Mills County, Oklahoma, T15N-R22W, Section 2 |
| 4/1/2011 | $31,500.00 | 129 | 4/27/2011 | Haynesville Prospect in Caddo Parish, Louisiana, T15N-R15W, Sections 10, 11 |
| 4/15/2011 | $60,000.00 | 102 | 3/29/2011 | Tonkawa Prospect, Roger Mills County, Oklahoma, T16N-R22W, Section 31 |
| 4/15/2011 | " " | 102 | 3/29/2011 | Tonkawa Prospect, Roger Mills County, Oklahoma, T16N-R22W, Section 34 |
| 4/19/2011 | $12,950.00 | 1013 | 4/15/2011 | South Harmony Church Prospect, Allen Parish, Louisiana, T6S-R5W, Section 12 |
| 5/2/2011 | $71,400.00 | 128 | 4/27/2011 | Chesapeake Tonkawa Prospect, Roger Mills County, Oklahoma, T16N-R22W, Section 23 |
| 5/25/2011 | $84,100.00 | 132 | 6/1/2011 | South Harmony Church Prospect, Allen Parish, Louisiana, T6S-R5W, Section 13 |

5

| Acquisition Date | Amount Paid | Check No. / Wire Transfer | Check / Wire Transfer Date | Represented Prospect Name / Property Location |
|---|---|---|---|---|
| 6/1/2011 | " " | 132 | 6/1/2011 | S. Harmony Church IV Prospect, Allen Parish, Louisiana, T6S-R5W, Section 15 |
| 5/25/2011 | $12,000.00 | 103 | 6/1/2011 | Port Hudson Prospect, East Baton Rouge Parish, Louisiana, T5S-R1W, Section 72 |
| 8/25/2011 | $75,200.00 | 101 | 7/10/2011 | West Edgerly Prospect, Calcasieu Parish, Louisiana, T9S-R12W, Section 26 |
| 8/25/2011 | $125,000.00 | 104 | 8/28/2011 | West Pilgrim Church Prospect, Allen Parish, Louisiana, T5S-R5W, Sections 26, 35 |
| 9/1/2011 | $63,000.00 | 106 | 8/28/2011 | Pinewood Prospect, Vernon Parish, Louisiana, T1S-R9W, Sections 18, 21, 22 |
| 1/1/2012 | $93,500.00 | 112 | 1/17/2012 | Haynesville Prospect, Desoto Parish, Louisiana, T15N-R14W, Section 16; T15N-R14W, Section 16 |
| 1/1/2012 | " " | 112 | 1/17/2012 | Tigre Lagoon Prospect, Vermilion Parish, Louisiana, T13S-R4E, Sections 25, 36; T13S-R4E, Sections 25, 36; T13S-R4E, Section 36 |
| 2/6/2012 | " " | 112 | 1/17/2012 | Haynesville Prospect, Caddo Parish, Louisiana, T15N-R15W, Section 8 |
| | $5,330,725.60 | | | |

US_WEST 803889909.1

6

# EXHIBIT B

EXHIBIT "B"

INTERESTS PURCHASED BY SCHAFFER FAMILY INVESTORS

| Acquisition Date | Amount Paid | Check No. | Check Date | Represented Prospect Name/Property Location |
|---|---|---|---|---|
| | $300,000.00 | 702 | 5/7/2012 | Encana Lease in Wilkinson County, Mississippi – T1N-R1W, Sections 3, 4, 15 |
| 2/13/2012 | $615,000.00 | 664 | 2/13/2012 | Lake Rosemound and Bayou Sara Prospect in West Feliciana Parish, Louisiana – T1S-R3W, Section 41; T1S-R2W, Sections 76, 82, 83 |
| 2/28/2012 | " " | 664 | 2/13/2012 | West Oberlin Prospect in Allen Parish, Louisiana – T5S-R4W, Section 20 |
| 3/19/2012 | $240,000.00 | 669 | 3/20/2012 | Tuscaloosa Marine Shale in West Feliciana Parish, Louisiana – T1S-R3W, Section 41; T1S-R2W, Sections 76, 82, 83 |
| 3/29/2012 | $496,000.00 | 671 | 3/29/2012 | NW Wilmer Prospect in Tangipahoa Parish, Louisiana – T2S-R7E, Section 34 |
| 5/29/2012 | $256,000.00 | 706 | 5/22/2012 | TMS Mineral Acquisition in St. Helena Parish, Louisiana – T1S-R6E, Sections 16, 22, 42 |
| 8/23/2012 | $194,400.00 | 738 | 8/13/2012 | Haynesville Prospect in Red River Parish, Louisiana – T13N-R11W, Section 4 |
| 8/23/2012 | " " | 738 | 8/13/2012 | TMS Prospect in Amite County, Mississippi – T1N-R5E, Section 15, 21, 22 |
| TOTAL | $2,101,400.00 | | | |

US_WEST 803889846.1

**PROOF OF SERVICE**

At the time of service, I was over 18 years of age and **not a party to this action**. I am employed in the County of Los Angeles, State of California. My business address is 300 South Grand Avenue, 14th Floor, Los Angeles, CA 90071.

On November 4, 2013, I served true copies of the following document(s) described as **FIRST AMENDED COMPLAINT FOR: (1) FEDERAL SECURITIES LAW VIOLATIONS BASED UPON SALE OF UNREGISTERED SECURITIES [15 U.S.C. §§ 77e(a), 77l(a)] AND FALSE REPRESENTATIONS AND NONDISCLOSURES [15 U.S.C. § 78j(b) and SEC Rule 10b-5]; (2) CALIFORNIA SECURITIES LAW VIOLATIONS BASED UPON SALE OF UNREGISTERED SECURITIES [Cal. Corp. Code §§ 25110, 25503] AND FALSE REPRESENTATIONS AND NONDISCLOSURES [Cal. Corp. Code §§ 25401, 25501]; (3) FRAUD; (4) BREACH OF FIDUCIARY DUTY; (5) BREACH OF CONTRACT; (6) INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS; (7) STATUTORY UNFAIR COMPETITION [Cal. Bus. & Prof. Code §§ 17200 _et seq._]; (8) ACCOUNTING; AND (9) LOUISIANA SECURITIES LAW VIOLATIONS BASED UPON SALE OF UNREGISTERED SECURITIES [La. Rev. Stat. §§ 51:714, 51:712, 51:705] AND FALSE REPRESENTATIONS AND NONDISCLOSURES [La. Rev. Stat. §§ 51:714, 51:712]; DEMAND FOR JURY TRIAL** on the interested parties in this action as follows:

Scott L. Baker, Esq.
Baker & Associates
1875 Century Park East, Suite 1490
Los Angeles, CA 90067

_**Attorneys for Defendant
Lee Sonnier**_

Thomas V. Reichert, Esq.
Gary S. Lincenberg, Esq.
Bird Marella Boxer Wolpert Nessim
   Drooks & Lincenberg PC
1875 Century Park East, 23rd FL
Los Angeles, CA 90067

_**Attorneys for Defendants Kris
Melancon; Pinnacle Oil & Gas, LLC;
and Lemel Petroleum. LLC**_

**BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed above and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with McKenna Long & Aldridge LLP's practice for collecting and processing correspondence for mailing. On the same day that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on November 4, 2013, at Los Angeles, California.

Irma L. Magaña

USW 804038297.1