1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FILED
CLERK, U.S. DISTRICT COURT

Aug 13, 2015

CENTRAL DISTRICT OF CALIFORNIA
BY: _____PMC_____ DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SCHAFFER FAMILY INVESTORS, ) 
LLC, a Delaware limited liability )
company; and ROBERT SCHAFFER, an )
individual, )
)
           Plaintiffs, )
)
     v. )
)
LEE SONNIER, an individual; KRIS )
MELANCON, an individual; PINACLE )
OIL & GAS, LLC, a Louisiana limited )
liability company; LEMEL )
PETROLEUM, LLC, a Louisiana limited )
liability company; and DOES 1 through 10 )
, inclusive, )
           Defendants. )
)

CASE NO. 2:13-CV-5814-SVW (JEMx)

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANT
LEE SONNIER'S MOTION TO
DISMISS SECOND AMENDED
COMPLAINT [67]

I.    INTRODUCTION

        This case arises from Plaintiffs' investments in oil, gas, and mineral royalty and

leasehold interests ("OGM Royalty Interests")—allegedly made with and through Defendants.

Plaintiffs assert that Defendants' slick talking induced Plaintiffs to pump money into purportedly

misrepresented investment opportunities.

        On May 9, 2013, Plaintiffs filed suit in this Court.  On November 26, 2014, the Court

dismissed without prejudice Plaintiffs' federal securities claims because Plaintiffs failed to plead

the existence of a security.  (Dkt. 61: Order at 8–10.)  The Court also stayed Plaintiffs' state law

claims pending resolution of the viability of their federal claims, which were the sole basis for this Court's jurisdiction.  (*Id.* at 10–11.)

On December 24, 2014, Plaintiffs filed their Second Amended Complaint ("SAC").[1] (Dkt. 62.)  The SAC asserts claims against Sonnier for: (1) selling unregistered securities, 15 U.S.C. § 77e(a), 77l(a); (2) federal securities fraud, 15 U.S.C. § 78j and 17 C. F. R. § 240.10b-5 ("Rule 10b-5"); (3) selling unregistered securities in violation of Cal. Corp. Code §§ 25110, 25504.1; (4) California securities fraud, Cal. Corp. Code §§ 25401, 25504.1; (5) fraud; (6) breach of fiduciary duty—joint venturers; (7) breach of fiduciary duty—agent; (8) breach of written contract—purchases of OGM Royalty Interests; (9) breach of verbal contract—agency agreement; (10) violation of California's Unfair Competition Law ("UCL"), Cal, Bus. & Prof. Code §§ 17200 *et seq.*; (11) "Accounting"; (12) selling unregistered securities in violation of Louisiana law, La. Rev. Stat §§ 51:714, 51:712(A)(1), 51:705; and (13) Louisiana securities fraud, La. Rev. Stat. §§ 51:714, 51:712(A)(2), 51:712(D).

Presently before the Court is Sonnier's motion to dismiss Plaintiffs' SAC  (Dkt. 67.)  For the reasons discussed below, the Court GRANTS IN PART and DENIES IN PART Sonnier's motion.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

Because the facts underlying this case are complex, and Sonnier's motion turns on the sufficiency of the pleadings, the Court here recounts the complaint's allegations in detail.[2]

### A.     The Main Actors

Plaintiff Robert Schaffer ("Schaffer") was the first plaintiff to invest in the purportedly fraudulent scheme.  Schaffer also brought his father, Herbert Schaffer ("Herbert"), into the alleged fraud. (SAC ¶ 25.)  Herbert is plaintiff Schaffer Family Investors, LLC's ("SFI") representative.  (*Id.*)  Herbert invested with the purported fraudsters on SFI's behalf.

Sonnier is the purported double-agent middleman at the center of the scheme.  He

---

[1]  Lee Sonnier ("Sonnier") is the sole remaining defendant in the action.  On February 7, 2014, Plaintiffs dismissed their claims against all other Defendants.  (Dkt. 40.)

[2]  Solely for purposes of the instant motion, the Court assumes all facts pled in the SAC are true.

1   allegedly induced Schaffer and SFI to make investments through him.  (SAC ¶¶ 15–31.)  He
2   orchestrated deals between Sonnier and the other Defendants.  Supposedly, in the course of
3   facilitating these transactions, he defrauded both sides of the deals.

4       Defendant Kris Melancon ("Melancon") is allegedly a highly experienced Louisiana
5   landman.  (SAC ¶ 15.)  Melancon was the purported brains behind the investments.  *See, e.g.*,
6   (SAC ¶ 14–15.)  Defendants Pinnacle Oil & Gas, LLC ("Pinnacle") and Lemel Petroleum, LLC
7   ("Lemel") (collectively with Melancon, the "Melancon defendants") are entities connected to
8   Melancon.

9       **B.    The Alleged Fraudulent Scheme**

10      In September 2007, Schaffer met Sonnier through a mutual friend.  (SAC ¶ 12.)  Shortly
11  thereafter, at another meeting with Schaffer and the mutual friend, Sonnier allegedly stated that:

12          (a) he was a retired attorney who came from a family of extensive wealth;
            (b) he was interested and active in various investment and business
13          activities; (c) years earlier he had been a participant in an investment group
            comprised of engineers, accountants, investors, and other attorneys; and (d)
14          such group had successfully invested in various deals throughout the years.

15  (*Id.*)  After this meeting, Schaffer, Sonnier, and the mutual friend sporadically looked at potential
16  investments.  (SAC ¶ 13.)

17      Around July 2008, Sonnier contacted Schaffer about an investment opportunity with
18  Melancon.  (SAC ¶¶ 14–15.)  Sonnier claimed that he had close ties with Melancon, who he
19  described as a highly experienced Louisiana landman.  (SAC ¶ 15.)  Sonnier claimed that
20  Melancon was in the business of investing in OGM Royalty Interests with his own funds and
21  with money raised from others.  (*Id.*)  Sonnier also said that Melancon had extensive connections
22  in and "special knowledge" of the oil and gas business.  (*Id.*)

23          *1.    Inception of the Purported Fraudulent Scheme*

24      Sonnier offered Schaffer an opportunity to co-invest in "the same OGM Royalty Interests
25  and in the same amount in which Sonnier, and/or his immediate family, would be investing[.]"
26  (SAC ¶ 17.) He  told Schaffer that "Melancon would be investing in the same OGM Royalty
27  Interests in an amount equal to what both Schaffer and Sonnier were investing[.]"  (*Id.*)  Thus,
28  Sonnier and Schaffer would each acquire one fourth of the OGM Royalty Interests and

1    Melancon would acquire the remaining one-half interest.  (*Id.*)  Based on these representations,

2    Schaffer "entered into a verbal agency agreement for Sonnier to serve as Schaffer's agent to

3    evaluate, recommend, acquire, verify, and administer on Schaffer's behalf the same OGM

4    Royalty Interests being purchased by Melancon and Sonnier as offered by the Melancon parties."

5    (SAC ¶ 18.)

6            *2.    The Flow of Assets and the Kickback Scheme*

7         Plaintiffs allege that the transactions "generally followed the same path."  (SAC ¶ 45.)

8    First, the Melancon defendants would identify a property where oil, gas, or mineral production

9    had commenced or was believed to be imminent (because of nearby producing wells or other

10   circumstances).  (*Id.*)  The Melancon defendants would then offer to purchase a fractional

11   interest in the OGM royalty interests from those interests' owners.  (*Id.*)  At that point, the

12   Melancon defendants would tell Sonnier that they had OGM Royalty Interests available for

13   purchase by one or both Plaintiffs.  (*Id.*)  Sonnier, allegedly representing that he was Plaintiffs'

14   agent while actually acting as the Melancon defendants' agent, would then represent to Plaintiffs

15   that he and the Melancon defendants were purchasing fractional undivided interests in the OGM

16   Royalty Interests.  (*Id.*)  He would then "offer Plaintiffs the opportunity to purchase from the

17   Melancon Parties fractional undivided interests in the OGM Royalty Interests."  (*Id.*)

18        Sonnier also allegedly represented that: (1) Plaintiffs' purchase price would be either the

19   Melancon defendants' actual purchase cost (for Schaffer's purchases before SFI became

20   involved) or the actual purchase cost plus a 3 percent markup (for purchases with SFI); (2)

21   Sonnier and the Melancon defendants (or their related entities or family members) would each

22   invest at least an equal amount and acquire at least an equal interest in the OGM Royalty

23   Interests; and (3) other than the 3 percent mark-up, there would be "no other financial benefit to

24   Schaffer, Melancon, or Sonnier, except for the benefit, shared jointly, of acquiring OGM Royalty

25   Interests on more favorable terms as a result of making combined purchases."  (SAC ¶¶ 20, 28,

26   45.)  Plaintiffs assert that while they were free to decide whether to purchase the OGM Royalty

27   Interests, they were entirely dependant on the Melancon defendants' and Sonnier's

28   recommendations of which interests to acquire.  (SAC ¶ 46.)

Each transaction was allegedly documented in "substantially the same way." (SAC ¶ 47.) First, one of the Melancon defendants purchased from the OGM Royalty Interest owner (often a landowner) a fractional undivided interest in the OGM Royalty Interest. (*Id.*) This purchase was made by a royalty deed signed by the purchaser and the seller. (*Id.*) The deed expressed the purchaser's interest as a fraction or percentage of "8/8ths of the whole of any oil, gas or mineral, except sulphur, on and under to be produced from said lands[.]" (*Id.*)

The Melancon defendants then "typically sent e-mails to Sonnier identifying by location, royalty acres, price per royalty acre, and status of development the OGM Royalty Interests that they had available for sale." (SAC ¶ 48.) Sonnier allegedly sent to Plaintiffs what he represented to be forwarded emails from the Melancon defendants, "adding his own comments and recommendations[.]" (*Id.*) However, Sonnier purportedly "often" altered the "forwarded" e-mails from the Melancon defendants by "for example, revising the e-mails to inflate the price per royalty acre or to make it appear that Sonnier would also be purchasing fractional undivided interests in the OGM Royalty Interests." (*Id.*) If a Plaintiff agreed to purchase an Interest, Sonnier would send that Plaintiff an invoice, which Plaintiffs would then pay to one of the Melancon defendants. (*Id.*) One the invoice was paid, the Melancon defendants would prepare an Assignment of Royalty Interests. (SAC ¶ 49.) Pursuant to these assignments, Plaintiffs received a fractional undivided interest in the underlying fractional undivided interest that the Melancon defendants had acquired from the OGM Royalty Interest owner—i.e. a fraction of a fractional interest. (SAC ¶ 50.)

Each Plaintiff purchased the OGM Royalty Interests with its own separate funds and took title to the Interest in its own name. (SAC ¶ 52.) Some of the real properties to which these interests pertained had operational wells. (*Id.*) Neither Plaintiffs nor Defendants operated wells or had rights to make decisions regarding wells or mining operations on those properties. (*Id.*) Instead, these rights were held by the working interest owners. (*Id.*) Royalties were paid by the oil drilling and production companies either to Plaintiffs directly or to the Melancon defendants, who were then to pay to Plaintiffs their share. (*Id.*) While Plaintiffs retained the right to transfer or sell the OGM Royalty Interests they "had no right to 'otherwise control' such interests." (*Id.*)

Plaintiffs allege that the Melancon defendants secretly retained a portion of Plaintiffs' funds sufficient to cover the Melancon defendants' acquisition costs plus a profit. (SAC ¶¶ 23, 31.) Plaintiffs further allege that the Melancon defendants also paid to Sonnier a substantial "finder's fee," which was generally paid out of the Melancon defendants' share of Plaintiffs' payments. (SAC ¶¶ 23, 31.)

Plaintiffs also allege that the Melancon defendants "paid a larger proportion of the monies received from [Plaintiffs] (generally paid from the monies paid by Schaffer as a result of Sonnier's mark-up of the price that the Melancon Parties said they would charge for the OGM Royalty Interests) to an inactive Louisiana corporation named Media/Right Properties, Ltd. ("Media/Right"). . . of which Sonnier is the sole officer[.]" (SAC ¶ 23; *see also* SAC ¶ 31.) The Melancon defendants purportedly claimed that they made this payment to Media/Right because Sonnier represented to them that Schaffer was receiving these payments. (SAC ¶¶ 23,31.) While these allegations are not abundantly clear, it appears that Plaintiffs allege that the Melancon defendants believed they were participating in a money laundering scheme of sorts, whereby the Melancon defendants would accept an inflated purchase price from Schaffer and SFI and transfer the overage to a different entity that they believed Schaffer owned (but which was actually owned by Sonnier).

### 3.   SFI's Involvement

Schaffer purportedly introduced Sonnier to SFI's representative—Schaffer's father, Herbert Schaffer. (SAC ¶ 25.) Plaintiffs allege that between February 2012 and August 13, 2012, SFI paid to the Melancon defendants approximately $2,101,4000 to purchase 13 OGM Royalty Interests (listed in Exhibit B to the SAC). (SAC ¶ 24.) SFI allegedly purchased each OGM Royalty Interest by accepting written offers "presented to it by Sonnier." (*Id.*)

Sonnier allegedly made the same representations to SFI that he made to Schaffer. (SAC ¶ 28.) As with Schaffer, Sonnier sent purportedly forwarded e-mails from Melancon to SFI. (SAC ¶ 29.) However, Sonnier allegedly altered these e-mails to inflate the purchase price and to falsely indicate that Sonnier was purchasing an equal share of the OGM Royalty Interests to that being offered to Plaintiffs. (*Id.*)

4.    *The Flip Properties*

In addition to the above investments, Schaffer purchased OGM Royalty Interest in three sets of properties, referred to as the "Flip Properties." (SAC ¶ 54.) Sonnier allegedly represented to Schaffer that they would make a quick profit by flipping these properties in two to four months. (*Id.*) Schaffer asserts that he believed the interests in the Flip Properties would be purchased with his money at the Melancon defendants' actual purchase cost and that they would be titled in his name. (*Id.*) The parties allegedly agreed that the "first two Flip Properties would be purchased 25% by Schaffer, 25% by Sonnier, and 50% by the Melancon Parties, and that the Melancon Parties would receive 50% of any profits made by Schaffer or Sonnier." (*Id.*) The parties purportedly agreed that Schaffer, the Melancon defendants, and Sonnier would each purchase 33.33% of the third set of Flip Properties, and that any profit made upon resale by Schaffer and Sonnier on their respective purchases would be split 60% to the purchaser (Schaffer or Sonnier) and 40% to the Melancon defendants. (*Id.*)

Schaffer purchased his interests in the Flip Properties between August and October of 2009. (SAC ¶¶ 56–59.) Sonnier and the Melancon defendants told Schaffer his payments would be used to purchase OGM Royalty Interests located in particular parishes in Louisiana, but did not specify the acreage or provide a legal description at the time of purchase. (SAC ¶ 56.) On October 23, 2009, Sonnier allegedly sent to Schaffer an e-mail soliciting his purchase of a 1/3 share in leasehold interests in four specifically identified tracts with a combined area of 556.74 acres. (SAC ¶ 58.) Sonnier allegedly told Schaffer that the four tracts belonged to one landowner who had been contacted by "Petrohawk, Chesapeake, and Comstock to lease these tracts[.]" (*Id.*) Sonnier allegedly further told Schaffer that the landowner had told the Melancon defendants that "'if we show up with $4,500.00/acre in the form of a cashier's check that she would lease to us' and that 'we should be able to flip this lease for $1,500.00/acre profit to which ever [*sic*] of the 3 companies pays us the $6,000.00/acre that they have offered to the landowner." (*Id.*) These were the third set of Flip Properties.

Several months after the third Flip Properties' purchase, ExxonMobil Corporation allegedly acquired substantial gas production rights in the areas where the parties had invested.

7

1  (SAC ¶ 60.)  Plaintiffs assert that "Sonnier and the Melancon Parties, through Sonnier, induced

2  Schaffer to consent to retention of interests in the Flip Properties based upon Melancon's

3  assertion that he wanted to see the effect of Exxon's purchase on the market." (*Id.*)

4      Sometime near early 2011, Sonnier told Schaffer that the third set of Flip Properties was

5  sold to Exxon in late 2010 and that "they" had received an approximately $1,500 per acre profit

6  plus a 1% override of whatever Exxon received from oil royalties." (SAC ¶ 61.)  Sonnier also

7  allegedly told Schaffer that "Melancon had decided, without Schaffer's knowledge or consent, to

8  forego the large cash gains from such purported sale and had instead retained the override

9  interests." (*Id.*)

10     Schaffer asserts that from September 2011 through April 2013, he made various attempts

11  to get more information about the Flip Properties.  (SAC ¶¶ 62–65.)  Around September 2011, he

12  learned that the Flip Properties had all been titled in the name of Melancon's corporation,

13  Pinnacle.  (SAC ¶ 62.)  He eventually uncovered a host of other misrepresentations, similar to

14  those alleged about the other OGM Royalty Interests.  (SAC ¶ 66.)

15  **III.    Legal Standard**

16     A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of the claims

17  stated in the complaint. Fed. R. Civ. Proc. 12(b)(6).  To survive a motion to dismiss, a complaint

18  "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

19  plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp.*

20  *v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff

21  pleads factual content that allows the court to draw the reasonable inference that the defendant is

22  liable for the misconduct alleged." *Id.*  A complaint that offers mere "labels and conclusions" or

23  "a formulaic recitation of the elements of a cause of action will not do." *Id.* (quoting *Twombly*,

24  550 U.S. at 555) (internal quotation marks omitted).  "Allegations in the complaint, together with

25  reasonable inferences therefrom, are assumed to be true for purposes of the motion." *Odom v.*

26  *Microsoft Corp*, 486 F.3d 541, 545 (9th Cir. 2007).  However, a Court need not accept legal

27  conclusions as true. *Iqbal*, 556 U.S. at 678.

28     Claims of fraud must be pleaded with particularity.  Fed. R. Civ. P. 9(b).  Where a claim

alleges a course of fraudulent conduct as its basis, the claim is said to be "grounded in fraud" and must satisfy Federal Rule of Civil Procedure 9(b). *Vess v. Ciba-Giegy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003). To satisfy Rule 9(b), the complaint must identify "the who, what, when, where, and how of the misconduct charged. *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (citing *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir.2010)). In other words, the complaint "must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *In re GlenFed Inc. Sec. Litig.*, 42 F.3d 1541, 1548 n.7 (9th Cir. 1994) (en banc). In all, the plaintiff must provide a "substantial amount of particularized information about the plaintiff's claim in order to enable [the defendant] to understand it and effectively prepare a response pleading and an overall defense of the actions." 5A Wright & Miller, *Federal Practice and Procedure: Civil 3d* § 1296 (3d ed. 2004).

If a court dismisses the complaint, it will freely grant leave to amend. *DeSoto.*, 957 F.2d at 658. In deciding whether to dismiss with prejudice, courts consider the following factors articulated by the Supreme Court in *Foman v. Davis*, 371 U.S. 178 (1962):

> undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.

*Id.* at 182; *see also Sharkey v. O'Neal*, 778 F.3d 767, 774 (9th Cir. 2015)**.**

## IV.   Analysis

Sonnier's motion points to a veritable well of alleged deficiencies in Plaintiffs' complaint. The Court addresses each argument in turn.

### A.   Whether Plaintiffs Allege a Security

Plaintiffs allege two federal securities law claim. These claims each require the existence of a "security," as defined by federal law. *See* 15 U.S.C. § 77e(a); 15 U.S.C. § 78j.[3] These

---

[3] The same definition of a "security" applies to each of these claims. *Reves v. Ernst & Young*, 494 U.S. 56, 61 n.1 (1990) (quoting *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 847 n.12 (1975)) (The "definition of a security in § 3(a)(10) of the 1934 Act, ... is virtually identical

1  claims also form the sole basis for this Court's jurisdiction.

2      Sonnier argues that, as with their FAC, Plaintiffs' SAC fails to adequately plead the

3  existence of a security, and thus that their federal claims should be dismissed.

4           1.    Legal Standard

5      "[U]nless the context otherwise requires[,]" a security is any "note, stock, . . . investment

6  contract, . . . fractional undivided interest in oil, gas, or other mineral rights . . .  or, in general,

7  any interest or instrument commonly known as a 'security'[.]"  15 U.S.C. § 77b(a)(1).  To

8  determine whether an interest is a security under federal law, courts go beyond labels and look to

9  the "economic reality" of the transaction.  *S.E.C. v. Howey*, 328 U.S.293, 298 (1946).  This

10  inquiry looks to whether the interest involves: (1) an investment of money ; (2) "in a common

11  enterprise";  (3) "with profits to come solely from the efforts of others."  *Id.* at 301; *see also*

12  *Stewart v. Ragland*, 934 F.2d 1033, 1037 (9th Cir. 1991) (quoting *Howey*, 328 U.S. at 298–99).

13      A common enterprise is one where the "fortunes of the investor are interwoven with and

14  dependent upon the efforts and success of those seeking the investment or of third parties."

15  *S.E.C. v. Goldfield Deep Mines Co. of Nevada*, 758 F.2d 459, 463 (9th Cir. 1985) (quoting *Brodt*

16  *v. Bache & Co.*, 595 F.2d 459, 460 (9th Cir. 1978)).  A common enterprise exists where there is

17  an "enterprise common to the investor and the seller, promoter or some third party (vertical

18  commonality) or an enterprise common to a group of investors (horizontal commonality)."

19  *Hocking v. Dubois*, 885 F.2d 1449, 1455 (9th Cir. 1989) (en banc).

20      The Ninth Circuit construes the third element liberally and discards "solely" from its

21  strictures.  *Id.* at 1455.  Thus, the third element is met where "the efforts made by those other

22  than the investor are the undeniably significant ones, those essential managerial efforts which

23  affect the failure or success of the enterprise."   *SEC v. Glenn W. Turner Enters, Inc.*, 474 F.2d

24  476, 482 (9th Cir. 1973).  This element focuses on the investor's ability to control his

25  investment.  Three non-exhaustive factors guide this inquiry: (1) whether "an agreement among

26  the parties leaves so little power in the hands of the partner or venturer that the arrangement in

27

28  [to the definition in the Securities Act of 1933] and, for present purposes, the coverage of the two Acts may be considered the same.").

fact distributes power as would a limited partnership"; (2) whether "the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers"; or (3) whether "the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers." *Koch v. Hankins*, 928 F.2d 1471, 1476-77 (9th Cir. 1991) (quoting *Williamson v. Tucker*, 645 F.2d 404, 424 (5th Cir.1981)).

This three part test was originally articulated with respect to whether a transaction was an "investment contract" and therefore a security. *See Howey*, 328 U.S. at 298–301. The Supreme Court has held it inapplicable where the alleged security is a stock, because stocks are one of the categories enumerated in 15 U.S.C. § 77b(a)(1). *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 694 (1985). However, the Court expressly limited this holding to stocks, and did not reach whether it applies to the numerous other categories of securities listed in § 77b. *Id.*

Some Circuits have extended this rationale to a fractional undivided interest in oil or minerals. *See, e.g.*, *Nolfi v. Ohio Kentucky Oil Corp.*, 675 F.3d 538, 546 (6th Cir. 2012); *Adena Exploration, Inc. v. Sylvan*, 860 F.2d 1242, 1249 (5th Cir. 1988); *Penturelli v. Spector, Cohen, Gadon & Rosen, Attorneys at Law*, 779 F.2d 160, 167 (3d Cir. 1985). In *Simon Oil Co. v. Norman*, 789 F.2d 780 (9th Cir. 1986), the Ninth Circuit commented favorably on *Penturelli*'s "well-reasoned" opinion on this issue . *Id.* at 781. Nevertheless, the Court declined to decide whether a fractional undivided interest in oil or mineral rights is a security as a matter of law. *Id.* at 782. Instead, the Court remanded for application of its fact-based test to decide whether the fractional undivided interests at issue were securities. *Id.* Because the Ninth Circuit continues to apply the *Howey* test to fractional undivided interests in oil or minerals, this Court declines Plaintiffs' invitation to hold them securities as a matter of law.

2.    Application

In its November 26 Order, this Court found that Plaintiffs' complaint was too ambiguous to adequately plead the existence of a security. (Nov. 26 Order, at 8–10.) Nevertheless, the Court noted that it appeared that Plaintiffs might plausibly be able to plead the existence of a

1   security under *Howey*.  (*Id.* at 9–10.)

2          Plaintiffs' SAC adequately fixes the problems identified in the Court's prior Order.  It is

3   now clear that Plaintiffs allege that the Melancon defendants purchased fractional undivided

4   OGM Royalty Interests and then sold to Plaintiffs a fractional interest in those fractional

5   interests.  It is also clear that Plaintiffs allege that: (1) they purchased the OGM Royalty Interests

6   with their own funds and took title to the assigned OGM Royalty Interests in their own name; (2)

7   that neither Plaintiffs nor Defendants were entitled to operate or manage wells or mines on the

8   real properties underlying the OGM Royalty Interests; (3) that Plaintiffs' only retained control

9   over the OGM Royalty Interests that they purchased was the right to transfer or sell them; and

10  (4) that Plaintiffs' only possible revenue from the OGM Royalty Interests was either payment of

11  their share of the royalties derived from the working interest owners' operations or the profits

12  from selling Plaintiffs' OGM Royalty Interests.

13          Plaintiffs adequately allege that they invested money in the OGM Royalty Interests.

14  They also allege a common enterprise: They assert a common enterprise with third

15  parties—those who owned the working interests in the underlying properties.  Under the terms of

16  the deeds and related assignments, Plaintiffs were entitled to a percentage of royalties generated

17  from oil, gas, or minerals produced by the properties' working interest owners.  Moreover,

18  Plaintiffs assert that they had no right to control this enterprise and were instead entirely

19  dependant on the working interest owners' success.  Thus, Plaintiffs adequately allege vertical

20  commonality.  *See S.E.C. v. Goldfield Deep Mines Co. of Nevada*, 758 F.2d 459, 463 (9th Cir.

21  1985) (finding vertical commonality where the mining company received a 25% royalty fee for

22  processing the investors' ore and where both the investors' and the company's fortunes were

23  dependent on the success of the company's unique ore processing technique).  While Plaintiffs

24  admit that not all properties contained operational wells, they assert that each property was one

25  on which a well was imminently anticipated.  Moreover, the sale of royalty interests itself

26  indicates the parties' anticipation that the underlying properties would produce something on

27  which a royalty would be paid.

28          Finally, Plaintiffs adequately allege that "the efforts made by those other than the

investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Glenn W. Turner Enters.*, 474 F.2d at 482. Here they assert that they received an interest in royalties, the amount of which is determined by the success or failure of the third parties holding the working interests on the relevant land. Plaintiffs assert that aside from the ability to transfer or sell their interests, they had no managerial control over the mining operations or oil wells on the subject properties. They also assert that they had no right to operate mines or wells on the subject properties. They thus satisfy the third *Howey* element.

For the aforementioned reasons, the Court FINDS that Plaintiffs adequately allege the existence of a security.

**B.      Plaintiffs' Federal Unregistered Securities Sale Claim**

Sonnier asserts that Plaintiffs' federal unregistered securities sale claim fails because: (1) claims relating to all but one transaction by SFI are time-barred, and (2) because SFI lacks standing to assert its claim.

First, Plaintiffs' claim is limited to sales of Royalty Interests made "one year or less prior to the filing of this lawsuit on August 9, 2013." (SAC ¶ 74.) Thus, even if Plaintiffs' SAC is less than a model of clarity, Sonnier's argument that their claim is time-barred lacks merit.

Next, Sonnier's argument that SFI lacks standing is properly construed as a motion to dismiss for failure to state a claim. Sonnier asserts that SFI lacks standing because SFI fails to state a claim. Sonnier argues that SFI's claim fails because SFI does not allege that the transactions at issue were not exempt from registration or that SFI is not an "accredited investor" within the meaning of the relevant regulations.

Plaintiffs correctly point out that Sonnier raises affirmative defenses, which Sonnier has the burden to plead. *See Eshelman v. Orthoclear Holdings, Inc.*, No. C 07-1429 JSW, 2009 WL 506864, at *11 (N.D. Cal. Feb. 27, 2009) ("The defendant has the burden of proving as an affirmative defense an offering's exempt status from registration, as well as qualification, requirements."). Moreover, it is not certain from the face of the complaint that the offering is exempt from registration or that SFI is an "accredited investor." Accordingly, Sonnier's

1   argument fails.  The Court therefore DENIES Sonnier's motion to dismiss Plaintiffs' claim for

2   the sale of unregistered securities.

3       **C.    Plaintiffs' Securities Fraud Claim Under Rule 10b-5**

4           Sonnier asserts that Plaintiffs' federal securities fraud claim fails to adequately allege a

5   representation attributable to Sonnier, a material misstatement, or scienter.[4]  Because this is a

6   fraud claim, it is subject to the heightened pleading requirements of Federal Rule of Civil

7   Procedure 9.  This standard is further heightened by the Private Securities Litigation Reform Act

8   of 1995 ("PSLRA").  The PSLRA requires Plaintiffs to state with particularity the facts

9   constituting the alleged violation and the facts evidencing scienter.  15 U.S.C. § 78u-4; *Tellabs,*

10  *Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)  Plaintiffs must specify each

11  statement alleged to have been misleading, the reasons why the statement is misleading, and, "if

12  an allegation regarding the statement or omission is made on information and belief, the

13  complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. §

14  78u-4(b)(1).  With respect to scienter, Plaintiffs must "state with particularity facts giving rise to

15  a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-

16  4(b)(2)(A).

17      1.    Whether the SAC Alleges a Representation Attributable to Sonnier

18          Sonnier argues that Plaintiffs fail to allege a misrepresentation attributable to Sonnier

19  under the standard established in *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct.

20  2296 (2011).  The thrust of Sonnier's argument is that because Plaintiffs allege that he merely

21  forwarded the alleged misrepresentations from the Melancon defendants to Plaintiffs, those

22  statements cannot be attributed to him.  At the outset, the Court notes that Sonnier's argument

23  fails with respect to the alleged misrepresentations that he purportedly stated directly to

24  Plaintiffs—for example, that Sonnier was a retired attorney.  However, as discussed below,

25

26  [4]  To state a claim under Rule 10b-5, a private plaintiff must allege: "(1) a material

27  misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the
    misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the
    misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Janus Capital Grp.,*

28  *Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2301 n.3 (2011) (quoting *Stoneridge Investment
    Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

1    whether the alleged misrepresentations in the emails that Sonnier forwarded to Plaintiffs are

2    attributable to Sonnier presents a more difficult question.

3            In *Janus*, the Court held that for purposes of Rule 10b-5, "the maker of a statement is the

4    person or entity with ultimate authority over the statement, including its content and whether and

5    how to communicate it." *Id.* at 2302.  The *Janus* Court formulated this rule in the context of

6    addressing whether an investment advisor could be liable for statements in prospectuses issued

7    by the entity it advised—which was a business entity related to but separate from the advisor.

8    *Id.* at 2299–01.  The Court noted the need to give "narrow dimensions" to the implied private

9    right of action under Rule 10b-5.  *Id.* at 2302.  Turning to the meaning of the word "make," the

10   Court stated that in the "ordinary case, attribution within a statement or implicit from

11   surrounding circumstances is strong evidence that a statement was made by 'and only by' the

12   party to whom it is attributed." *Id.*  The Court further found that "the maker of a statement is the

13   entity with authority over the content of the statement and whether and how to communicate it."

14   *Id.* at 2303. The Court also rejected the Government's argument that "make" should be defined

15   as "create."  *Id.* at 2303.

16           Applying this standard to the case before it, *Janus* held that the investment advisor did

17   not "make" any of the statements in the advised entity's prospectuses.  *Id.* at 2304.  In reaching

18   its holding, the Court noted that the prospectuses were filed by the advised entity, and that there

19   was no allegation that the investment advisor actually filed them and falsely attributed them to

20   the advised entity.  *Id.* at 2305.  The Court also expressly declined to define what it means to

21   communicate a "made" statement "indirectly."  *Id.* at 2305 n.11.  The Court stated that it did not

22   need to reach that issue because none of the statements in the prospectuses were implicitly or

23   explicitly attributed to the investment advisor.  *Id.*  According to the Court, "[m]ore may be

24   required to find that a person or entity made a statement indirectly, but attribution is necessary."

25   *Id.*

26           The case at bar presents the issue of whether an agent who forwards his principal's

27   statements in an email but does not help draft the statements may nonetheless be charged with

28   making them.  Plaintiffs allege that Sonnier secretly altered the purportedly forwarded emails

1  before sending them and added his own comments to their text.  Sonnier is properly charged as
2  the "maker" of statements that he altered in the forwarded emails and falsely attributed to the
3  Melancon defendants.  Unlike *Janus*, Plaintiffs allege that these statements were falsely
4  attributed to the Melancon defendants.  Moreover, Plaintiffs assert that Sonnier communicated
5  these statements to them.  This is thus not the "ordinary" case where attribution is strong
6  evidence that a statement was made by the party to whom it is attributed.  *See In re Galena*
7  *Biopharma, Inc. Sec. Litig.*, No. 3:14-CV-367-SI, 2015 WL 4643474, at *29 (D. Or. Aug. 5,
8  2015).

9       While some of Plaintiffs' pleadings are generalized allegations of what often happened,
10  they also describe specific emails sent by Melancon to Sonnier, which Sonnier allegedly altered
11  and then "forwarded" to Plaintiffs.  (SAC ¶¶ 21, 29.)  Specifically, Plaintiffs identify and
12  describe allegedly falsified emails that Sonnier sent to Schaffer on October 19, 2009; January 13,
13  2012' and April 24, 2012 and an email that Sonnier sent to SFI on April 24, 2012.  (SAC ¶¶ 21,
14  29.)  The Court finds that these assertions sufficiently allege that Sonnier made
15  misrepresentations.

16       However, the issue is more complicated to the extent that Sonnier merely acted within
17  the scope of his agency with the Melancon defendants and accurately forwarded the Melancon
18  defendants' emails pursuant to their instructions.  The Court has not located any case directly on
19  point, nor have the parties pointed to any such case.  As a general matter, an agent is personally
20  liable for his torts, even if they were committed while acting in accord with the principal's
21  instructions.  3 Witkin, Summary 10th (2005) Agency, § 199, p. 252.  However, *Janus* states that
22  in the context of a private claim under Rule 10b-5, one who prepares or publishes a statement on
23  another's behalf is not the statement's maker.  *Janus*, 131 S. Ct. at 2302.  Instead, the maker of a
24  statement is the one who has control over the statement—"including its content and whether or
25  how to communicate it."  *Id.*

26       Given the need to preserve the narrow scope of the implied private right of action under
27  Rule 10b-5 and in light of the strict pleading standards established by Federal Rule of Civil
28  Procedure 9 and the PSLRA, the Court FINDS that Plaintiffs allegations that Sonnier forwarded

unaltered emails do not sufficiently allege a misrepresentation chargeable to Sonnier.  It appears

from the Complaint that, to the extent that Sonnier forwarded the Melancon defendants'

unaltered emails, he merely published the statements on their behalf.  Given that Sonnier was

allegedly the Melancon defendant's agent acting within the scope of his agency, it does not

appear that Sonnier had control over the statement's contents or whether or how to communicate

them.  He thus was not their maker.  *See N. Port Firefighters' Pension--Local Option Plan v.*

*Temple-Inland, Inc.*, 936 F. Supp. 2d 722, 741-42 (N.D. Tex. 2013) (finding that the defendant

did not make statements contained in an Information Statement on a related entity's letterhead

that were preceded by a letter that was on the defendant's letterhead, signed by the defendant's

CEO/chairman, and which referred the defendant's shareholders to the "enclosed information

statement" describing the related entity).[5]

Additionally, Plaintiffs fail to either describe in detail or attach any specific email from

Sonnier to Plaintiffs in which he forwards the Melancon defendants' unaltered email.

Particularly when viewed through the harsh lens of *Janus*, the generalized allegations in which

Plaintiffs describe these emails are insufficient to satisfy Rule 9 or the PSLRA.  Nevertheless,

Plaintiffs may still be able to allege that Sonnier made these misrepresentations.  For example,

Sonnier could be liable for these misrepresentations if he adopted them as his own.  *See Janus*,

131 S. Ct. at 2305 n.12 (rejecting plaintiff's theory of liability because hosting a document on a

website doesn't indicate that the host "adopts the document as its own statement or exercises

control over its content; *see also Temple-Inland*, 936 F Supp. 2d at 743 (stating that *Janus*

leaves open the possibility that a company could face liability for a statement made by another in

a document that the company adopts as its own).

The Court also FINDS inadequate Plaintiffs' assertions that Sonnier typically or

generally made certain alleged misstatements.  While Plaintiffs allege that Sonnier made various

---

[5]  The parties' briefs do not focus on the Flip Properties.  Nevertheless, the Court notes that while Plaintiffs' allege that "Sonnier told Schaffer" various details about oil companies' offers to the landowner, in context it is insufficiently clear that these statements were attributed to Sonnier rather than Melancon.  The Court therefore DISMISSES WITHOUT PREJUDICE Plaintiffs' federal securities fraud claim to the extent that it is based on Sonnier's alleged misstatements about the Flip Properties.

false statements "in Los Angeles County, California in or about July 2008 and at various times thereafter," they fail to allege particular instances when he made these statements.  Plaintiffs thus fail to describe exactly when or where he made them, or to allege any other details about the circumstances under which they were made.  Such generalized pleadings are insufficient to satisfy the high standards of both Rule 9 and the PSLRA.[6]

For the aforementioned reasons, the Court DENIES IN PART Sonnier's motion insofar as it pertains to allegedly falsified emails that Sonnier sent to Schaffer on October 19, 2009; January 13, 2012; and April 24, 2012; and to an email that Sonnier allegedly sent to SFI on April 24, 2012.  For the aforementioned reasons, the GRANTS IN PART Sonnier's motion and DISMISSES WITHOUT PREJUDICE Plaintiffs' federal securities fraud claim to the extent it is based on : (1) allegations that Sonnier typically or generally made certain misstatements; or (2) the allegedly unaltered emails that Sonnier forwarded to Plaintiffs.  Because the Court cannot say that amendment would be futile, the Court GRANTS Plaintiffs leave to amend their Rule 10b-5 claim.

> 2. Whether the SAC Sufficiently Pleads a Material Misstatement and Scienter

Sonnier further asserts that Plaintiffs' federal securities fraud claim fails to plead a material misstatement or scienter.  In light of the above holding partially dismissing Plaintiffs' federal securities fraud claim, the Court only addresses these arguments insofar as they pertain to the remaining portion of this claim.

A plaintiff asserting a Rule 10b-5 claim must show that the defendant made a statement that was "*misleading* as to a *material* fact."  *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)).  A misrepresentation is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered

---

[6]  Additionally, though Plaintiffs specifically quote and describe two emails sent by Sonnier on July 31, 2012, they fail to plead that they purchased securities in reliance on these emails.  (SAC ¶ 33.)  Accordingly, the Court FINDS that Plaintiffs fail to state a claim based on these two July 31 emails.

1    the 'total mix' of information made available." *Id.* (quoting *Basic*, 485 U.S. at 231–32).  A

2    statement is misleading "if it would give a reasonable investor the impression of a state of affairs

3    that differs in a material way from the one that actually exists." *In re Cutera Sec. Litig.*, 610

4    F.3d 1103, 1109 (9th Cir.2010) (internal quotation marks omitted).

5            The remaining portions of Plaintiffs' federal securities fraud claim pertain to the four

6    specifically identified and described emails that Sonnier purportedly altered and sent to Plaintiffs

7    on October 19, 2009; January 13, 2012; and April 24, 2012.  Plaintiffs allege the date on which

8    these emails were sent, their sender, their recipient, a detailed description of the alleged

9    misstatements, and allege details regarding the ways in which Sonnier falsified them.  (SAC ¶¶

10   21, 29.)  Moreover, Plaintiffs allegations indicate (depending on the email) that Sonnier's

11   alterations artificially inflated the purchase price and/or the number of acres that Melancon was

12   offering to Plaintiffs.  Thus, Plaintiffs adequately plead material misstatements and scienter.  *In*

13   *re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012)

14          Sonnier's argument to the contrary is inapposite.  Though he attempts to slip into the

15   PLSRA a requirement that the complaint specify where and when the alleged misstatement was

16   made, no such requirement appears on the face of the statute.  Regardless, the complaint's

17   description of particular emails that were materially altered in particular ways and transmitted by

18   Sonnier to Plaintiffs on particular dates sufficiently alleges both material misrepresentations and

19   scienter.

20          For the aforementioned reasons, the Court DENIES Sonnier's motion to dismiss

21   Plaintiff's federal securities fraud claim for failing to adequately plead material

22   misrepresentations or scienter.

23          **D.      Plaintiffs' State Securities Claims**

24          Because the Court finds that Plaintiffs allege a claim under federal securities law, the

25   Court now reaches Plaintiffs' previously stayed state-law claims.  Plaintiffs assert claims under

26   California and Louisiana law for the sale of unregistered securities and for securities fraud.

27   Sonnier argument that these claims fail because Plaintiffs fail to allege a security is inapt.

28   Because Plaintiffs satisfy the *Howey* test, they also adequately allege a security under California

1    law.  *Moreland v. Dep't of Corps.*, 194 Cal. App. 3d 506, 513 n.3 (Cal. Ct . App. 1987).

2    Plaintiffs' allegations of fractional undivided OGM Royalty interests also adequately allege a

3    security under Louisiana law.  *Caldwell v. Trans-Gulf Petroleum Corp.*, 322 So. 2d 171, 174

4    (La. 1975); *see also State v. Powdrill*, 684 So. 2d 350, 354 (La. 1996) (stating that the Louisiana

5    security laws are similar to the federal regime).

6         Sonnier further argues that Plaintiffs' California securities claims fail because California

7    securities laws require strict privity between the purchaser and seller and limit liability to the

8    "actual true sellers of securities."  (Mem. P. & A. 23.)  Thus, Sonnier asserts that he cannot be

9    liable under California securities laws because Plaintiffs allege that they purchased the OGM

10   Royalty Interests directly from the Melancon defendants.  However, as Plaintiffs point out,

11   California Corporations Code § 25504.1 imposes joint and several liability on anyone who,

12   "with intent to deceive or defraud[,]" "materially assists" in securities fraud or in selling

13   unregistered securities.  Cal. Corp. Code § 25504.1.

14        To face liability under § 25504.1, a person must materially assist in the alleged securities

15   law violation.  *Arei II Cases*, 216 Cal. App. 4th 1004, 1014 (Cal. Ct. App. 2013)  "[F]or purposes

16   of section 25504.1, it is not enough that a person provided material assistance in a larger scheme

17   to defraud if that person had no role or involvement in the part of the scheme that constituted a

18   violation of the securities laws."  *Id.*  Such assistance may "take the form of aiding in the

19   preparation of offering documents relied upon by investors, communicating misrepresentations

20   directly to investors, or otherwise playing a material, facilitating role" in the alleged securities

21   law violation.  *Id.* at 1015.  "Intent to defraud is defined as the intent to induce reliance on a

22   knowing misrepresentation or omission."  *Moss v. Kroner*, 197 Cal. App. 4th 860, 872 (Cal. Ct.

23   App. 2011).

24        Because Plaintiffs assert that Sonnier forwarded from the Melancon defendants emails

25   offering to sell Plaintiffs unregistered securities, Plaintiffs adequately plead that Sonnier

26   materially assisted in the selling of unregistered securities.  However, Plaintiffs fail to allege that

27   Sonnier had any knowledge that the securities for sale were unregistered.  Thus, Plaintiffs'

28   California claim against Sonnier for materially assisting in the sale of unregistered securities

1   fails.  *See id.* (finding that plaintiffs stated a claim that defendants materially assisted in the sale

2   of unregistered securities where plaintiffs alleged, *inter alia*, that the defendants knew that the

3   securities were unregistered).  Additionally, though Plaintiffs allege that Sonnier forwarded the

4   Melancon defendants' false statements without alteration, they fail to allege facts indicating that

5   Sonnier knew that the forwarded statements were false.  Read as a whole, Plaintiffs complaint

6   could mean either that Sonnier knew that the Melancon defendants' statements were false or that

7   he believed them to be true and (to the extent that Sonnier altered them) was trying to cheat both

8   the Melancon defendants and Plaintiffs.  Thus, although Plaintiffs allege that Sonnier knowingly

9   made misrepresentations by altering the "forwarded" emails, Plaintiffs fail to allege that he

10  knowingly assisted in the *Melancon defendants'* securities fraud.  Thus, Plaintiffs' California

11  securities claims against Sonnier fail.

12       For the aforementioned reasons, the Court GRANTS IN PART Sonnier's motion and

13  DISMISSES WITHOUT PREJUDICE Plaintiffs' California claims against Sonnier for the sale

14  of unregistered securities and for securities fraud.  Nevertheless, because the Court cannot say

15  that amendment would be futile, the Court GRANTS Plaintiffs leave to amend their complaint.

16       **E.       Plaintiffs' Breach of Fiduciary Claims**

17            1.       Breach of Fiduciary Duty—Joint Venture

18       Plaintiffs allege two breach of fiduciary duty claims.  Sonnier asserts that the first of

19  these claims, arising from a relationship as joint venturers, fails because Plaintiffs fail to allege

20  the existence of a joint venture.

21       Plaintiffs allege that Sonnier owed Plaintiffs a fiduciary duty because he was a "putative

22  joint venturer" of theirs with regard to the purchases made by Plaintiffs, Sonnier, and the

23  Melancon defendants.  (SAC ¶ 114.)  Under California law, to allege a joint venture a plaintiff

24  must allege: (1) "the members must have joint control over the venture (even though they may

25  delegate it)," (2) "they must share the profits of the undertaking," and (3) "the members must

26  each have an ownership interest in the enterprise."  *Simmons v. Ware*, 213 Cal. App. 4th 1035,

27  1051-52 (Cal. Ct. App. 2013), *as modified on denial of reh'g* (Mar. 13, 2013) (quoting

28  *Unruh-Haxton v. Regents of University of California*, 162 Cal. App. 4th 343, 370 (Cal. Ct. App.

2008)).  The existence of a joint venture depends on the parties' intentions.  *Id.* at 1052.

Here, Plaintiffs assert that each investment opportunity was separately offered to them before the purchase was made.  They also allege that "Sonnier and the Melancon Parties, through Sonnier, induced Schaffer to consent" to retaining interests in the Flip Properties."  (SAC ¶ 60.) In other words, Plaintiffs imply that Sonnier and Melancon were not entitled to control the Flip Properties.  Additionally, Plaintiffs assert that they received written assignments documenting their interests in the OGM Royalties and vesting title to those properties in Plaintiffs' name. Thus, based on Plaintiffs' allegations, it does not appear that the parties intended that they would have joint control over any of their investments.

For the aforementioned reasons, the Court FINDS that Plaintiffs fail to allege the existence of a joint venture.

### 2.    Breach of Fiduciary Duty—Agent

Sonnier asserts that Plaintiffs' breach of fiduciary duty—agent claim fails because Plaintiffs fail to allege an agency relationship or the existence of any fiduciary duty.

To establish an agency relationship under California law, a Plaintiff must allege:

> (1) An agent or apparent agent holds a power to alter the legal relations
> between the principal and third persons and between the principal and
> himself;(2) an agent is a fiduciary with respect to matters within the scope
> of the agency; and(3) a principal has the right to control the conduct of the
> agent with respect to matters entrusted to him.

*Mayfield v. Cnty. of Merced*, No. 1:13-CV-01619 LJO, 2014 WL 5822913, at *6 (E.D. Cal. Nov. 10, 2014) (quoting *Garlock Sealing Technologies, LLC v. NAK Sealing Technologies Corp.*, 148 Cal. App. 4th 937, 964 (Cal. Ct. App. 2007), *as modified on denial of reh'g* (Apr. 17, 2007)).

Here, Plaintiffs do not allege that they gave Sonnier the power to contract with third parties on their behalf, nor do they allege that they had the right to control his conduct regarding matters entrusted to him.  Instead, Plaintiffs seemingly assert that they trusted Sonnier to advise them, but retained authority to decide whether to accept any individual investment before it was made.  Moreover, the Court need not accept Plaintiffs' conclusory statement that they "entered into a verbal agency agreement for Sonnier to serve as [Plaintiffs'] agent to evaluate, recommend, acquire, verify, and administer on [Plaintiffs'] behalf" the OGM Royalty Interests.

(SAC ¶¶ 17, 26.)  Not only is this statement conclusory, but to the extent that it asserts that Sonnier was authorised to acquire and administer OGM Royalty Interests on Plaintiffs' behalf, it is belied by Plaintiffs' other allegations.  Plaintiffs clearly allege that Sonnier presented them with investment opportunities purportedly sent by the Melancon defendants, and that "if a Plaintiff *agreed* to purchase" an OGM Royalty Interest, then Sonnier would send that Plaintiff an invoice—which the Plaintiff would then pay to one of the Melancon defendants.  (SAC ¶ 48) (emphasis added).

Additionally, Plaintiffs's reliance on *Zalk v. General Exploration Co.*, 105 Cal. App. 3d 786, 792–93 (Cal. Ct. App. 1980), is inapt.  *Zalk* is distinguishable because there the alleged agent was the principal' s full-time employee, received from the principal an office and secretarial assistance, and was contractually bound to act in the principal's interest.  *Id.* at 793–94.

For the aforementioned reasons, Plaintiffs fail to allege the existence of an agency relationship between themselves and Sonnier.

### 3.    Conclusions Regarding Breach of Fiduciary Duty Claims

In their Opposition, Plaintiffs assert that Sonnier owed them a fiduciary duty by virtue of a confidential relationship.  While such allegations could establish the existence of a fiduciary duty, Plaintiffs fail to plead this theory in their complaint.

For the aforementioned reasons, the Court GRANTS IN PART Sonnier's motion and DISMISSES WITHOUT PREJUDICE Plaintiffs' "Breach of Fiduciary Duty—Joint Venture" and "Breach of Fiduciary Duty—Agent" claims.  Because the Court cannot say that amendment would be futile, the Court GRANTS LEAVE to Plaintiffs to amend their complaint.

### F.    Plaintiffs' Breach of Contract Claim

Plaintiffs assert claims for "Breach of Written Contract—Purchases of OGM Royalty Interests" and for "Breach of Verbal Contract—Agency Agreement."

To state a claim for breach of contract, a plaintiff must allege: (1) the existence of a contract between plaintiff and defendants, (2) plaintiff's performance or excuse for nonperformance of the contract, (3) defendant's breach, and (4) the resulting damages.

1   *Concorde Equity II, LLC v. Miller*, 732 F. Supp. 2d 990, 1000 (N.D. Cal. 2010) (quoting *Careau*

2   *& Co. v. Sec. Pac. Bus. Credit, Inc.*, 272 Cal. Rptr 387, 395 (1990)).  "An essential element of a

3   contract is the consent of the parties, or mutual assent; in other words there must be a meeting of

4   the minds."  *Diehl v. Starbucks Corp.*, No. 12CV2432 AJB BGS, 2014 WL 295468, at \*5 (S.D.

5   Cal. Jan. 27, 2014) (citing Cal. Civ. Code § 1550(2); *Bustamente v. Intuit, Inc.*, 141 Cal. App.

6   4th 199, 209 (Cal. Ct. App. 2006).

7        Plaintiffs allege that they purchased each OGM Royalty Interest pursuant to a separate

8   written contract.  (SAC ¶ 131.)  Plaintiffs assert that these contracts were "founded upon an

9   instrument in writing, e-mails sent by Sonnier to Plaintiffs offering OGM Royalty Interest for

10  purchase by Plaintiffs."  (*Id.*)  Read in the context of the rest of the SAC, this statement asserts

11  that Plaintiffs entered contracts founded upon offers that the Melancon defendants emailed to

12  Sonnier and which he forwarded to Plaintiffs.  These emails were allegedly relayed by Sonnier

13  within the scope of his agency relationship with the Melancon defendants.  (SAC ¶¶ 20, 28.)

14  There is no allegation that Sonnier himself, acting in his personal capacity, made any offer to

15  Plaintiffs or accepted any offer from Plaintiffs.[7]  There is thus no allegation that Plaintiffs and

16  Sonnier mutually assented to a contract.

17        Plaintiffs also assert that Sonnier breached a verbal agency agreement with Plaintiffs.

18  Plaintiffs' conclusory assertions that they entered into a verbal agency agreement with Sonnier

19  and that this was a binding contract are  insufficient to establish the existence of a contract.

20  Moreover, Plaintiffs fail to allege that they provided to Sonnier any consideration for his

21  supposed agreement to act as their agent.  *See Gallagher v. Holt*, 436 F. App'x 754, 755 (9th Cir.

22  2011) (citing Cal. Civ.Code § 1550) (stating that under California law, "consideration is an

23

24  [7]  The Court notes that Plaintiffs allege that "Sonnier and the Melancon Parties agreed that, in the
    event they were unable to deliver marketable title to any of the OGM Royalty Interests, they

25  would refund the monies paid by Plaintiffs for those Interests."  (SAC ¶ 70.)  Nevertheless, such a
    bare allegation is insufficient to establish a contract.  Plaintiffs fail to allege any details regarding

26  the circumstances of contract formation, whether this agreement was oral or written, and what (if
    any) obligations this purported agreement imposed on Plaintiffs  Moreover, Plaintiffs' breach of

27  contract claim incorporates this marketable title obligation into their allegations describing the
    substance of the agreements allegedly arising from the emails that the Court finds insufficient to

28  establish a contract between Sonnier and Plaintiffs.  Finally, Plaintiffs do not assert that the
    allegation regarding the agreement to provide marketable title is itself sufficient to establish a
    contract between Sonnier and Plaintiffs.

1    essential element of a contract"). Instead, Plaintiffs insist that Sonnier indicated that he would

2    receive no financial benefit from their purchase of the OGM Royalty Interests. (SAC ¶¶ 23, 31.)

3    In fact, Plaintiffs claim that if they had know that Sonnier would receive a financial benefit from

4    their purchase of the OGM Royalty Interests that they would not have purchased those Interests.

5    (SAC ¶¶ 23, 31.) Finally, allegations that Sonnier spent a substantial amount of time working

6    with Plaintiffs and describing the economic and legal aspects of the OGM Royalty Interest

7    purchases are insufficient to remedy the defects described above.

8          For the aforementioned reasons, the Court GRANTS IN PART Sonnier's motion and

9    DISMISSES WITHOUT PREJUDICE Plaintiffs' breach of contract claims. Because the Court

10    cannot say that amendment would be futile, the Court GRANTS Plaintiffs leave to amend their

11    complaint.

12          **G.**    **Plaintiffs' Unfair Competition Claim**

13          Sonnier asserts that Plaintiffs' UCL claim should be dismissed to the extent that the case

14    involves a security because the UCL does not apply to securities transactions. *Bowen v. Ziasun*

15    *Technologies, Inc.*, 116 Cal. App. 4th 777, 790 (Cal. Ct. App. 2004). Plaintiffs apparently do not

16    dispute that their claim fails to the extent that they seek to apply the UCL to securities

17    transactions. Instead, they argue only that their claim is proper to the extent that the lawsuit does

18    not involve a securities transaction.

19          For the aforementioned reasons, the Court GRANTS IN PART Sonnier's motion and

20    DISMISSES WITHOUT PREJUDICE Plaintiffs' UCL claim to the extent that it applies to

21    securities transactions. Moreover, because the Court only dismisses Plaintiffs' UCL claim to

22    the extent that it seeks to impermissibly apply the UCL to securities transactions, the Court notes

23    that it is highly skeptical of Plaintiffs' ability to amend this claim to remedy this defect.

24    Nevertheless, because the Court cannot say that amendment would surely be futile, the Court

25    GRANTS Plaintiffs leave to amend their complaint. However, in light of the foregoing, the

26    Court WARNS Plaintiffs that the next dismissal of this claim will be with prejudice.

27          **H.**    **Plaintiffs' "Accounting" Claim**

28          Plaintiffs assert a separate "accounting" claim. Sonnier correctly argues that this claim

fails because accounting is a remedy and not a cause of action.  *Nguyen v. JP Morgan Chase Bank*, No. SACV 11-01908 DOC, 2012 WL 294936, at *3 (C.D. Cal. Feb. 1, 2012) (*citing Batt v. City and County of San Francisco*, 155 Cal. App. 4th 65, 67 (Cal. Ct. App. 2007)).

For the aforementioned reasons, the Court GRANTS IN PART Sonnier's motion and DISMISSES WITHOUT PREJUDICE Plaintiffs' "accounting" claim.  Nevertheless, because the Court cannot say that amendment would surely be futile, the Court GRANTS Plaintiffs leave to amend their complaint.  However, in light of the foregoing, the Court WARNS Plaintiffs that the next dismissal of this claim will be with prejudice.

## V.    ORDER

1. For the aforementioned reasons, the Court DENIES IN PART Sonnier's request to dismiss Plaintiffs' federal securities fraud claim insofar as it pertains to allegedly falsified emails that Sonnier sent to Schaffer on October 19, 2009; January 13, 2012; and April 24, 2012; and to an email that Sonnier allegedly sent to SFI on April 24, 2012.

2. For the aforementioned reasons, the Court GRANTS IN PART Sonnier's motion and DISMISSES WITHOUT PREJUDICE Plaintiffs' federal securities fraud claim to the extent it is based on :

(1) allegations that Sonnier typically or generally made certain misstatements;
(2) the allegedly unaltered emails that Sonnier forwarded to Plaintiffs; or
(3) Sonnier's alleged misstatements about the Flip Properties.

Because the Court cannot say that amendment would be futile, the Court GRANTS Plaintiffs leave to amend their Rule 10b-5 claim

3. For the aforementioned reasons, the Court GRANTS IN PART Sonnier's motion and DISMISSES WITHOUT PREJUDICE Plaintiffs' California claims against Sonnier for the sale of unregistered securities and for securities fraud.

4. For the aforementioned reasons, the Court GRANTS IN PART Sonnier's motion and DISMISSES WITHOUT PREJUDICE Plaintiffs' "Breach of Fiduciary Duty—Joint Venture" and "Breach of Fiduciary Duty—Agent" claims.

5. For the aforementioned reasons, the Court GRANTS IN PART Sonnier's motion and DISMISSES WITHOUT PREJUDICE Plaintiffs' breach of contract claims.

6. For the aforementioned reasons, the Court GRANTS IN PART Sonnier's motion and DISMISSES WITHOUT PREJUDICE Plaintiffs' UCL claim to the extent that it applies to securities transactions.

11. For the aforementioned reasons, the Court GRANTS IN PART Sonnier's motion and DISMISSES WITHOUT PREJUDICE Plaintiffs' "accounting" claim.

12. For the aforementioned reasons, the Court DENIES IN PART Sonnier's motion in all respect not described in paragraphs 1–11 above.

13. To the extent that the Court dismisses without prejudice Plaintiffs' complaint, the

1 | ///

2 | Court GRANTS Plaintiffs' leave to amend their complaint.  Any amended complaint SHALL be
3 | filed within 30 days of this Order's issuance.

4 | **IT IS SO ORDERED.**

5 |

6 | Dated: August 13, 2015

7 |

8 | STEPHEN V. WILSON
United States District Judge